**Sammie FELDER, Jr., Appellant,**

v.

**The STATE of Texas, Appellee.**

No. 70840.

Court of Criminal Appeals of Texas, En Banc.

Sept. 16, 1992.

Connie B. Williams, Houston, Tx., Jay Topkis, Dina R. Hellerstein, New York City, for appellant.

John B. Holmes, Jr., Dist. Atty. and Mary Lou Keel, Joan Campbell and Steve Baldassano, Asst. Dist. Attys., Houston, Robert Huttash, State's Atty., Austin, for the State.

## OPINION

CLINTON, Judge.

Appellant was convicted of capital murder for intentionally causing the death of James Hanks, a quadriplegic, by cutting and stabbing him with a pair of scissors while in the course of committing robbery. At appellant's first trial, he was convicted and punishment was assessed at death. His conviction was affirmed on appeal. *Felder v. State*, 564 S.W.2d 776 (Tex.Cr. App.1978). However, a panel of the Fifth Circuit Court of Appeals ultimately reversed and ordered appellant's release or a new trial. *Felder v. McCotter*, 765 F.2d 1245 (5th Cir.1985). Appellant's second trial also resulted in a conviction, and once again punishment was assessed at death. On appeal, this Court reversed and remanded for a new trial. *Felder v. State*, 758 S.W.2d 760 (Tex.Cr.App.1988). At appel-

lant's third trial, he was also convicted and sentenced to death and it is this conviction which appellant now appeals. Article 37.-071(h), V.A.C.C.P.

Appellant raises thirteen points of error in his initial brief and three points of error in a supplemental brief, all of which will be considered. Because appellant makes a claim of insufficiency of the evidence to support the conviction, a recitation of the facts is necessary.

In the early morning hours of March 14, 1975, Emma Carroll, an attendant with Independent Life Styles, a company which provided daily services for handicapped people at the Westbury Country Village Apartments, had been assigned to care for the deceased, James C. Hanks, a quadriplegic. As Carroll was making her second round to Hanks' apartment to reposition him in his bed as was required every two hours, she noticed his door was open. Carroll thought this was unusual because when she had checked on him two hours earlier, she remembered closing the door. After calling out his name and receiving no reply, Carroll left the apartment and called Watson, who was the staff supervisor and a personal friend of Hanks. The door was open when Watson arrived at the apartment, so he walked straight to Hanks' bedroom to determine whether there was anything out of the ordinary. Watson found Hanks in bed; however, his breathing was faint, his head was turned over his shoulder in a very awkward position, and he had knots on each side of his head. Watson also noticed that there was blood on the mattress underneath Hanks. After making sure that an ambulance had been called, Watson tried to stimulate Hanks' breathing until medical help arrived. During the time Watson was awaiting the arrival of the ambulance, he began looking for Hanks' wallet, which Hanks always kept underneath his pillow when he was sleeping. Watson was unable to locate it.

B.G. Stilley, a Houston police officer, received an ambulance call on the evening of March 14, 1975, to respond to a scene at the Westbury Country Village Apartments. When Stilley arrived, an unconscious Hanks had already been loaded into an ambulance and was leaving the scene. Stilley proceeded to Hanks' apartment. After entering the bedroom, Stilley noticed that the sheets on the bed were covered with blood and there were pillows on the floor. He did not notice blood anywhere else in the bedroom or in the apartment. A complete search of the apartment was conducted to try to determine the type of weapon used or whether anything unusual had occurred in any other part of the house, but nothing was discovered. Stilley then left the scene to determine the status of Hanks condition and was informed that Hanks' had sustained puncture type wounds to his left and right temples and his neck with a sharp object. Hanks was subsequently placed on life support.

Watson testified that after about three hours at the hospital he returned to Hanks' apartment to try to determine what had happened that evening. Watson noticed two things which appeared to be out of the ordinary. Because Hanks was a quadriplegic, he usually kept his wallet with a fair amount of cash under his pillow when he was in bed; however, the wallet was still nowhere to be found. Watson also noticed that a pair of stainless steel surgical scissors that were usually kept on a table near the bed were also missing. Watson stated that he last saw Hanks' wallet when Hanks placed it under his pillow that evening. It was possible that other residents and staff may have known where Hanks kept his wallet. While there was no sign of forced entry into the apartment, the door to Hanks' apartment had been unlocked and accessible to anyone. Testimony was also elicited from Watson that although appellant was scheduled to work the day Hanks was found, he failed to report to work that day, or thereafter. Nor did he leave a forwarding address to receive his paycheck.

Edith Cobb testified that she had met appellant in Denver in August of 1974 and she helped him get a job. By November of the same year appellant left Denver and travelled to Texas. Cobb did not see appellant again until the end of March, 1975, when he appeared at her father's house

and asked for a ride to the liquor store. Once they arrived at the liquor store, Cobb asked appellant if he would like some help in finding a job and appellant informed her "he could not work because he had killed a man in Houston." Appellant told Cobb that while he was in Houston he worked at some type of hospital and one day while he was working, he saw a paralyzed man that lived there and noticed that he had a lot of money on him. Appellant got off of work at two o'clock in the afternoon and at about two or three in the morning he went back to the man's apartment to rob him. He carried a gun with him in case someone tried to stop him. Appellant related to Cobb that as he was trying to take the money the man woke up, called him by his name, and asked him what he was doing. Appellant grabbed a pair of scissors next to the bed and started stabbing the man "back and forth" in the head and throat. Appellant then told Cobb he took a pillow and tried to smother the man because the man was crying, "please don't hurt me." Appellant continued stabbing the deceased until it looked as though he was no longer breathing. Afterward, he took over three hundred dollars from underneath the pillow, went to his car, and threw the scissors out the window as he was driving. Appellant's brother drove him to the airport the same day and he caught a plane to Denver. Cobb asked appellant why he killed the man if he was paralyzed and appellant replied, "a dead man tells no tales." She also stated that she was not sure whether she believed him because he was not remorseful and was "kind of laughing" as he told her what happened. Appellant also told Cobb that his mother told him not to return to Houston or Taylor because the police were looking for him.

On April 14, 1975, Brent Carlson, a police officer with the Idaho Falls Police Department in Idaho was running radar for the traffic department. After watching appellant commit a traffic violation, Carlson pulled him over and asked him for some identification. Appellant produced a draft card with the name Alvin Eugene Yost on it and after a driver's license number under this name and date of birth could not be obtained, appellant was arrested. Carlson eventually found some identification with appellant's name on it and subsequently learned of the outstanding warrant in Houston.

■ In his eleventh point of error, appellant alleges the evidence is insufficient to support a finding that he is guilty of the offense of capital murder. To support this contention appellant argues that Hanks did not die as a direct result of his actions but rather as a result of the removal of the life support system which Hanks was placed on. Additionally appellant argues there is insufficient evidence to prove he intended to fatally harm the complainant or that he committed a robbery.

In the case at bar, there is ample evidence that the stab wounds inflicted upon the deceased by the appellant were the cause of death. Dr. Robert Jordan, a medical examiner who reviewed but did not prepare the autopsy report, testified that the wound to the left temple penetrated approximately two and one-half to three inches into the brain. Although he testified that it would be difficult to determine the type of instrument that caused the injury, he said the injuries were consistent with someone being stabbed with a pair of long, slender scissors. There was also a cutting wound to the right temple which did not penetrate the bone and there were eight wounds to the neck, all of which could have been created with a sharp instrument such as surgical scissors. In response to questions regarding brain death, Jordan stated that when placed on a life support system all of a person's organs continue to function because a machine is breathing for the patient. Once the machine is removed, the functions cease. A person diagnosed as brain dead is considered "legally dead" and the removal from a life support system is of no consequence since death has already occurred. The physician, staff and family can then make the decision whether to discontinue the life support system. Jordan testified that after reading the autopsy report, it was his medical opinion that the injury to the left temple

was the fatal injury which caused the death of the deceased.

Appellant cites *Robbins v. State*, 717 S.W.2d 348 (Tex.Cr.App.1986), to support his position that the death of the deceased was not the result of his actions but rather the result of a concurrent cause clearly sufficient in itself to cause the death of the deceased.[1] However, as pointed out in the State's brief, appellant does not suggest what other cause might have accounted for Hanks' death. The argument advanced by appellant that the removal of the life support system caused the death is unpersuasive. Hanks would not have required any life support had it not been for the actions of appellant. An uninjured person placed on a life support system would not die if the system was disconnected; and but for the actions of appellant, the deceased would never have been placed on life support. See *Branch v. State*, 774 S.W.2d 781, 785 (Tex.App.—El Paso 1989, pet. ref'd). The medical examiner in the instant case testified that it was the injury to the left temple which was the cause of death. The jury was instructed that in order to convict appellant of capital murder it had to find that appellant "intentionally cause[d] the death of" Hanks. From the aforementioned evidence and testimony, a rational trier of fact could have found that appellant caused Hanks' death beyond a reasonable doubt. See, e.g., *Jackson v. Virginia*, 443 U.S. 307 at 319, 99 S.Ct. 2781 at 2789, 61 L.Ed.2d 560 at 573 (1979); *Fierro v. State*, 706 S.W.2d 310, 313 (Tex.Cr. App.1986).

■ Appellant also contends that there was no evidence appellant intended to fatally harm Hanks. However, testimony elicit-

ed during the trial revealed that appellant carried a gun with him in the event anyone tried to stop him from committing the robbery. Appellant's intent to fatally harm Hanks was also apparent by the number and location of the stab wounds inflicted upon the deceased. The medical examiner testified that there was a reasonable expectation that death would result in regard to the location and depth of the wound to the left temple and this wound was in fact the cause of death. Testimony was also elicited from Edith Cobb that appellant attempted to smother the deceased with a pillow to hush his cries and when he discovered that Hanks was still breathing, he resumed stabbing him in the neck and throat once again. Additionally, Cobb testified appellant killed Hanks because "dead men tell no tales." This evidence justifies a jury finding that appellant intended to cause Hanks' death.

■ Thirdly, appellant contends that the evidence is insufficient to show that he committed a robbery. Appellant argues the State failed to prove the existence of a wallet in the deceased's room or that appellant was the person who took the wallet if there was one in the room. As support for this contention, appellant points to the fact that the deceased's room was unlocked and anyone could have entered the apartment. Watson testified that the last time he saw the deceased's wallet was at five o'clock on the evening of his death. He recalled Hanks placing the wallet underneath his pillow as he always did when he was in bed. Edith Cobb's testimony revealed that appellant told her he saw the deceased with a lot of money earlier in the day and that

1. Appellant cites V.T.C.A. Penal Code, § 6.04(a), which provides:

"A person is criminally responsible if the result would not have occurred but for his conduct, operating either alone or concurrently with another cause, unless the concurrent cause was clearly sufficient to produce the result and the conduct of the actor clearly insufficient."

Appellant never requested the trial court to submit an instruction under this provision. Even assuming appellant had requested and obtained such an instruction, we would hold the evidence as to causation sufficient. It might be said that

under the circumstances taking Hanks off of life support systems "was clearly sufficient" to cause his death. But given the fact that it was appellant's conduct which caused Hanks to be placed on life support systems in the first place, and that without life support systems he died, it can hardly be said that appellant's conduct "was clearly insufficient" to cause Hanks' death. "An accused may be exonerated under the statute only if his conduct alone was clearly insufficient to produce the result and the concurrent cause clearly sufficient, operating alone, to do so." *Branch v. State*, 774 S.W.2d 781, 784–85 (Tex.App.—El Paso 1989, pet. ref'd.).

he went back to rob the deceased later that evening. This evidence presents a rational basis for the jury to conclude appellant killed Hanks in the course of committing robbery. Appellant's eleventh point of error is overruled.

■ In points of error nine and ten appellant complains the trial court erred in refusing to allow defense counsel to question prospective jurors Cheryl Callahan Jones and Alberta Hanks after the State's challenge for cause against each was granted. This Court has frequently held that a trial court commits error when it refuses defense counsel permission to question a veniremember in a death penalty case. See, e.g., *Perillo v. State*, 656 S.W.2d 78 (Tex.Cr.App.1983); *White v. State*, 629 S.W.2d 701, (Tex.Cr.App.1982); *Vanderbilt v. State*, 629 S.W.2d 709 (Tex.Cr.App.1981). According to Article 35.17 subd. 2, V.A.C.C.P.:

> In a capital felony case, the court shall propound to the entire panel of prospective jurors questions concerning the principles, as applicable to the case on trial, of reasonable doubt, burden of proof, return of indictment by grand jury, presumption of innocence, and opinion. Then, on demand of the State or defendant, either is entitled to examine each juror on voir dire individually and apart from the entire panel, and may further question the juror on the principles propounded by the court.

However, this Court has also held that the error may be harmless when the record shows that the venireman was questioned at length and unequivocally stated that he could not vote for the death penalty under any circumstances. See, e.g., *Drinkard v. State*, 776 S.W.2d 181, 184 (Tex.Cr.App. 1989); *Sawyers v. State*, 724 S.W.2d 24, 29 (Tex.Cr.App.1986) (overruled on other grounds); *Perillo*, 656 S.W.2d at 80; *White*, 629 S.W.2d at 706.[2]

In the instant case, the trial court questioned prospective veniremember Jones as follows:

> "Q. ... Let me ask you the personal question. Do you, yourself, have any

conscientious, religious or moral scruples against the infliction of death as a punishment for crime in a proper case?

A. Yes, I do.

Q. Could you tell me about that, please?

A. I don't believe I have the right to decide whether another person should live or not.

Q. Is this based on your religious training?

A. Yes, it is.

Q. And are you telling me it would make no difference to you what the facts or circumstances would be in any case, you would never vote in such a way where the defendant would receive the death penalty?

A. Yes.

Q. And that would be you would always automatically give answers to those special issues that would insure the defendant received a life sentence as opposed to the death penalty?

A. Yes.

Q. That would be the same, no matter what the evidence of the trial might reveal to you?

A. Yes.

Q. Is there any question I could ask you that would change your mind about that in any direction?

A. I don't believe there is.

Q. You said I don't believe.

You realize as a juror you could either, no matter what the evidence showed you, answer one of the questions no or refuse to answer a question to insure the defendant would receive a life sentence and not the death penalty. You understand that?

A. Yes.

Q. Are you telling me you would always take that position, either not answering a question or answering it no, no matter what the evidence would be, to insure the defendant did not receive the death penalty?

2. But see this writer's dissenting opinion in

*Drinkard*, 776 S.W.2d at 188.

A. I wouldn't—based on those two questions, I couldn't answer the second one yes.

Q. No matter what the facts might be?

A. Yes.

Q. Is that because of your position on the death penalty?

A. It is because of the question.

Q. Are you saying that—what is there about the question that bothers you, predicting the future?

A. Right.

Q. Are you saying no matter what the facts would be, you could never answer that question yes?

A. Yes.

Q. No matter what evidence the State brought you, you would always automatically answer that question no.

A. I wouldn't say automatically, but I would answer it no.

Q. Would it make any difference to you what the facts of the case would be or are you telling me you would always answer the question no?

A. I guess I have to say yes—

Q. You don't have to say anything.

A. I would answer it no.

Q. That would be again no matter what the facts about the case or the person would reveal to you?

A. Yes.

Q. No matter who the person was, because of your religious position on the death penalty, you would always answer that question no?

A. Yes.

Q. Every time?

A. Yes.

[PROSECUTOR]: We have a motion to excuse the juror.

[THE COURT]: That will be granted.

[DEFENSE ATTORNEY]: May I ask the juror a couple of questions?

[THE COURT]: No, sir. You are free to go.

If you need an excuse for your employer, you can pick it up right here.

[THE COURT]: You want something on the record?

[DEFENSE ATTORNEY]: Yes, sir. Object to the Court's ruling, not allowing counsel to examine the venire person, Cheryl D. Callahan Jones, for the reason she first stated she was opposed to the death penalty and, secondly, stated she could never answer Issues 1 and 2 on the punishment hearing yes because of the death penalty and it was against her religion. She later changed to say Issue 2, she would definitely never answer yes, I suppose meaning she could answer 1 yes. We should have had the opportunity to examine her on the point since this was her first time being confronted with these kinds of issues. Looking at her intellectual background, she might have reconsidered.

We would like the record to reflect this was a black person that was excused and one that we would like to talk to.

[THE COURT]: The record will reflect Cheryl Callahan Jones was a black female and it is the Court's opinion she was unequivocal in her answers to the questions."

Jones initially stated that she had religious or moral scruples against the infliction of death as punishment. In response to questioning, she stated she did not believe she had the right to decide whether a person lived or died and she would never vote in a way where the defendant would receive the death penalty. Furthermore, no matter what the evidence in a case might disclose, she would either refuse to answer a question or would answer the question "no" so that the punishment would not be death. The testimony shows Jones never equivocated in her responses regarding her attitude toward the death penalty, nor was there any indication that she might do so upon further questioning.

Appellant also complains that venireman Hanks was likewise wrongfully challenged for cause upon the conclusion of questioning by the court. The record indicates the trial court questioned Hanks in the following manner:

"Q. ... Now, let me ask you the personal question. Do you yourself have any conscientious or religious or moral

scruples against the infliction of the death as a punishment for a crime in a proper case?

A. Yes.

Q. All right.

Could you tell me—would you base that upon your religious or your own morals or what?

A. Religious and morals.

Q. All right.

And as I told you earlier there is no right answers or wrong answers. You're entitled to feel however you do about it, but I have to ask you a few more questions for the law.

Are you telling me that you in—would never be able to participate with 11 other people in answering those two questions, yes, no matter what the evidence would show you knowing that the defendant would receive the death penalty?

A. Yes, that's right.

Q. You would never be able to do that?

A. I would never.

Q. Would you always automatically answer one of the questions, no, knowing if since all 12 have to agree to yes, is that correct?

Would you always automatically answer one of the questions, no, to insure that the defendant did not receive the death penalty no matter what the evidence showed you?

A. That—okay, you mean that he did not—would not receive the death—death penalty. Yes, I would never.

Q. You would never answer both questions, yes?

A. As for death penalty?

Q. Right?

A. I would not.

Q. Never, no matter what the facts of any case would show you?

A. No.

Q. All right.

And don't be confused. I just have to ask the question to you several different ways to be sure that your answer is what you want it to be.

What I'm saying would you automatically—you understand that it would take all 12 of you to agree that, yes, is the correct answer to both questions. So you as a juror if you have personal, religious, moral feelings concerning the death penalty, if you would have some other choices you would always automatically answer one question, no, therefore that would guarantee he would not receive the death penalty or just refuse to answer a question because all 12 have to answer it, yes, in order for him to get the death penalty? You're telling me that what's [sic] you would do. You would either answer one of the questions, no, or refuse to answer in every case no matter what the facts would be?

A. Yes, to keep him from getting the death penalty I would, yes.

Q. And because of your personal scruples based on your own morals and your personal or religious beliefs, you would never consider answering both questions, yes, knowing if you did that the defendant would receive the death penalty no matter what the facts would be?

A. Yes.

Q. Good enough. Anything?

[PROSECUTOR]: I have a motion, Your Honor.

[THE COURT]: It will be granted.

[DEFENSE ATTORNEY]: Your Honor, at this time I would like to question the juror.

[THE COURT]: That will be denied. You're free to go.

[DEFENSE ATTORNEY]: In regards to juror number one, Alberta Hanks, we object to the Court not allowing us to question the juror as stated on her capital murder attitude scale with the proposition not withstanding [sic] the answers that she gave in light of the fact that she listed that as one of her positions which means that capital punishment is justified in some cases. I would like to have an opportunity to explore that and also for the record to reflect that she was a black juror.

[THE COURT]: She was a black juror and the record will reflect she was totally without hesitation and unequivocal in her answers.

[DEFENSE ATTORNEY]: I take it that this questionnaire on Alberta Hanks will be part of the Court's records.

[THE COURT]: Certainly."

Appellant does not complain of the granting of the State's challenge for cause. His complaint is that he was not allowed the chance to rehabilitate these prospective veniremen after they were questioned by the court. Appellant cites *Campbell v. State*, 685 S.W.2d 23 (Tex.Cr.App.1985) and *Powell v. State*, 631 S.W.2d 169 (Tex.Cr.App. 1982), to support the proposition that because the trial court erred in violating Article 35.17 subd. 2, supra, this case should be reversed and remanded for a new trial. These cases are inapposite. Both *Campbell*, supra, and *Powell*, supra, are cases that have to do with denying questioning which would enable the intelligent exercise of peremptory challenges. In both cases, the trial court refused to allow "proper" questioning regarding the theory of punishment veniremen preferred in arriving at a verdict, and we held this denied the appellant the ability to intelligently exercise his peremptory strikes. Here, the trial court had determined that Jones and Hanks were challengeable for cause. Under these circumstances, further questioning pursuant to the intelligent exercise of peremptory challenges would be pointless. This cause is governed, rather by *Drinkard*, 776 S.W.2d at 181; *Sawyers*, 724 S.W.2d at 24; *Perillo*, 656 S.W.2d at 78; *White*, 629 S.W.2d at 701.

Appellant complains Hanks gave different answers on the stand from those she gave in a pre-trial questionnaire and he should have been given an opportunity to explore the discrepancy. The questionnaire consisted of questions which one could agree or disagree with regarding capital punishment. Hanks indicated she disagreed with the statement "capital punishment is absolutely never justified." This is the statement appellant argues he should have been allowed to inquire about. However, Hanks' responses to the questions also indicated she was opposed to capital punishment under any circumstances and could not vote for the death penalty regardless of the facts and circumstances of the case. Both Jones and Hanks stated unequivocally that they had religious and moral scruples against the death penalty and would never under any circumstances answer both questions yes knowing that the defendant would receive the death penalty. Although it is error for the trial court to disallow questioning in a capital case, where the prospective juror unequivocally states views regarding the death penalty which would impair her duties as a juror, the court has deemed the error is harmless. See, e.g., *Drinkard*, 776 S.W.2d at 184; *Sawyers*, 724 S.W.2d at 29; *Perillo*, 656 S.W.2d at 80; *White*, 629 S.W.2d at 706. Points of error nine and ten are overruled.

■ Appellant's second and third points of error allege improper argument at the guilt/innocence phase of trial by the prosecutor. In point of error two appellant argues the prosecutor engaged in improper argument by interjecting her opinion as to how the jury should interpret certain evidence when she argued:

"... You will recall the testimony from the doctor that someone who is brain dead is legally dead, so at that point there couldn't be any taking of life. There is introduced into evidence the attending physician's report and I think that is going to be the best evidence. You can make your own decision of what Mr. Hanks' state was, and the very last sentence is: Over the next four days he remained unresponsive to pain with fixed and dilated pupils, had two EEG's 24 hours reporting no cerebral activity. You can interpret it however you mean. I suggest to you that it means brain dead."

Appellant's counsel objected to the suggestion by the prosecutor, the objection was sustained, and an instruction to disregard was given; however, a motion for mistrial was denied.

■ This Court has held that there are four permissible areas of jury argument: (1) summation of the evidence; (2) reasonable deduction from the evidence; (3) answer to argument of opposing counsel; and

(4) pleas for law enforcement. E.g., *Todd v. State*, 598 S.W.2d 286, 296–97 (Tex.Cr. App.1980). An argument which exceeds these bounds is error; however, it only becomes subject to reversal if, in light of the record as a whole, the argument is extreme or manifestly improper, violative of a mandatory statute or injects new facts, harmful to the accused, into the trial. See, e.g., *Bell v. State*, 724 S.W.2d 780 (Tex.Cr.App.1986); *Cannon v. State*, 668 S.W.2d 401 (Tex.Cr.App.1984).

Appellant argues that by suggesting to the jury that the deceased was "brain dead," the prosecutor was improperly "analyzing the evidence" and "injecting her own interpretation of the attending physician's report." The State in reply argues that the argument was proper as a reasonable deduction and summation of the evidence. The medical examiner testified that brain death occurs when there is no brain activity or control and the records which were admitted into evidence stated that Hanks had "no cerebral activity." A prosecutor's summary of what has already been admitted into evidence is allowed. See *Purtell v. State*, 761 S.W.2d 360, 372–73 (Tex.Cr.App. 1988). We hold the argument here was a reasonable deduction from the testimony elicited and the evidence admitted. In the alternative, the sustaining of the objection by the trial court and the instruction to disregard given to the jury was sufficient to cure any error which may have occurred. See *Gardner v. State*, 730 S.W.2d 675 (Tex. Cr.App.1987).

■ In point of error three appellant argues the prosecutor once again engaged in improper argument when she interjected her opinion by stating:

"... This is a strong case. It may not have been a long case but it is a strong case by the evidence presented to you."

An objection by appellant's counsel was sustained, the jury was instructed to disregard and a motion for mistrial was once again denied. To support this contention, appellant cites *Robillard v. State*, 641 S.W.2d 910 (Tex.Cr.App.1982); *Menefee v. State*, 614 S.W.2d 167 (Tex.Cr.App.1981); and *Clayton v. State*, 502 S.W.2d 755 (Tex.

Cr.App.1981). These cases do not control. In *Robillard*, supra, the prosecutor bolstered the credibility of a written statement by asserting his belief in its veracity; in *Menefee*, supra, the credibility of the only eyewitness was bolstered; and in *Clayton*, the prosecutor stated he wouldn't prosecute a man "he didn't know in his heart was guilty." *Clayton*, 502 S.W.2d at 757. A prosecutor "may argue his opinions concerning issues in the case so long as the opinions are based on the evidence in the record and not as constituting unsworn testimony." *McKay v. State*, 707 S.W.2d 23, 37 (Tex.Cr.App.1985). In the instant case the prosecutor referred the jury to the evidence in the case and opined that it was strong, without eliciting unsworn testimony. In any event, once again the trial court's sustaining of the objection and instruction to disregard cured any possible error. *Gardner*, supra. Points of error two and three are overruled.

■ Appellant complains in point of error four that the prosecutor engaged in improper argument at the punishment phase by injecting statements outside the record, *viz:*

"[PROSECUTOR]: ... Think about the eight pricks to the neck. What were those about? Is he dead? Is he moving anymore? Is he breathing?
[DEFENSE ATTORNEY]: Objection. Totally outside the evidence.
[THE COURT]: Overruled. The jury has heard the evidence.
[PROSECUTOR]: A reasonable deduction from the evidence that those pricks to the neck were not the things intended to cause Mr. Hanks' death, so what were they? You can make your own decision based on the evidence. Was it torture or a testing method to see if he is still breathing anymore? ..."

On appeal, appellant objects to the suggestion that appellant tortured the deceased. Testimony during the trial revealed that the deceased was stabbed repeatedly "back and forth" in the head and neck. The medical examiner testified there were eight neck wounds which "measured up to one half an inch in length and up to three-

eighths of an inch in length." But he further testified that the cause of death was a stab wound to the left temple which penetrated two and one-half inches to three inches into the brain.

It seems clear to us that, taken as a whole, this argument invites the jury to speculate as to appellant's motive in inflicting the neck wounds. However, at the time appellant objected, the prosecutor had merely posed a series of questions. ("What were those about? Is he dead? Is he moving anymore? Is he breathing?") He had not yet suggested any answers, and indeed, if anything the argument to this point merely emphasizes what the evidence does not show. At this juncture appellant's objection was not well taken, and was properly overruled. It may be argued that the prosecutor stepped outside the record in later inviting the jury to fill the evidentiary gap with speculation that appellant had tortured his victim. However, the trial judge was not called upon to rule on such a contention, for appellant failed to renew his objection once this argument was made. We conclude that error, if any, was not preserved for appeal. Tex. R.App.Proc. 52(a). Appellant's fourth point of error is overruled.

◼ Appellant's sixth point of error also complains of improper argument at the punishment phase when the prosecutor, in speaking about the chaplains who testified at the punishment phase, argued:

"... How do all of these men see him? About one and a half hours every other week at church. What was each one of their precise statements? I have never seen any violent behavior from Mr. Felder. They see him now in the most restrictive confinement allowed at TDC."

Appellant objected that this argument was "outside the evidence." The objection was overruled. Appellant argues that there was no evidence that defined "restrictive confinement" in terms of the prison population; nor was there any testimony as to appellant's living conditions or that he lived under "restrictive" conditions. We do not agree.

The record reveals that two Texas Department of Corrections chaplains and a psychiatrist testified as to appellant's living conditions.[3] Chaplain Timmons testified that the cell block that appellant was assigned to was more restrictive than the general prison population and had more security. He also testified that appellant lived in a cell designed for one and was not allowed a cell mate. Chaplain Taylor also testified he knew appellant lived in the area of the prison where only one person is allowed per cell. Dr. Priscilla Ray testified that appellant told her that he lived under the most restrictive living conditions available at the prison. The record clearly shows that testimony was elicited from two chaplains and a psychiatrist regarding his living conditions and the fact that he was more restricted than the general prison population. Despite the fact that there was no testimony which defined "restrictive confinement," as appellant complains, we believe that the prosecutor's argument was an accurate summation of the evidence. Todd, supra. Point of error six is overruled.

◼ Point of error five also complains of improper argument at the punishment phase of trial when the prosecutor "suggested her personal definition of the word 'society'" by stating:

"[PROSECUTOR]: Do you find from the evidence beyond a reasonable doubt that there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society? ... Are you satisfied there is a probability this man will commit criminal acts of violence that would constitute a continuing threat to not the inmates in the Texas Department of Corrections, that's not what it says."

At this point, appellant objected that "the question is not saying that." The objection was sustained, an instruction to disregard was given, and a request for mistrial was denied. The prosecutor continued her argument by stating:

3. Now the Texas Department of Criminal Justice, Institutional Division.

"I guess I'll ask you to look at the word. What word did the legislature choose? They chose the word society. Society, social, people, society. And you can decide who society is. Who is society? I'll tell you what. This, I would suggest to you, is the resume of Mr. Sammie Felder in society."

Once again appellant objected to "the characterization of society as being only the group of people outside of prison that is suggested from that comment." The objection was overruled.

As stated in the State's brief, appellant does not specify whether he is now claiming error in that part of the argument preceding his objection, or that which followed. We shall address both arguments. In the first, the prosecutor suggested that "society" only referred to the population outside of the Texas Department of Corrections. This Court has held to the contrary. See *Caldwell v. State*, 818 S.W.2d 790, 798 (Tex.Cr.App.1991), citing *Rougeau v. State*, 738 S.W.2d 651, 660 (Tex.Cr.App.1987) (overruled on other grounds). Accordingly, the trial court sustained appellant's objection, instructed the jury to disregard, and denied appellant's motion for mistrial. While this argument was improper, error was cured by the trial court's instruction to disregard. For all we can tell on the cold record, the second argument by the prosecutor did not suggest a limitation on the definition of society; rather, he simply told the jury that they could decide for themselves what "society" meant. "Unless specifically defined, all words and phrases used in the Code are to be construed as normally accepted in common language." Article 3.01, V.A.C.C.P. Because the jury is indeed free to decide what is normal acception in common language, we perceive no error in this argument. Point of error five is overruled.

Point of error seven complains the trial court erred in admitting testimony that appellant possessed identification of others and presented that identification as his own to a police officer prior to being arrested. Specifically, appellant objects to the testimony as "being indicative of possibly some other extraneous offense before the jury and that it was irrelevant to any issue in the case at that time." Both objections were overruled.

The testimony of which appellant complains was elicited from two witnesses during the guilt/innocence phase of trial. Edith Cobb testified that after appellant told her of the circumstances of the murder, he showed her two "ID's" which contained different names on them. Brent Carlson, the arresting officer, also testified that when he pulled appellant over for a traffic violation, appellant produced a social security card and a draft card, neither of which contained appellant's name. Appellant's trial objection amounts to a claim that the testimony was inadmissible as violative of Tex.R.Crim.Evid., Rule 404(b).[4] *Montgomery v. State*, 810 S.W.2d 372, 387 (Tex.Cr.App.1990).

Appellant argues that the testimony allowed into evidence enabled the jury to infer that the "ID's" were possibly the result of a robbery of another person committed by appellant. We do not agree. In order for an extraneous offense to be admissible at trial, it must be relevant to a material issue in the case other than the defendant's character. *Id.* at 387. The relevance of this testimony can be seen when one evaluates the circumstances leading up to the arrest. Appellant left Houston, the scene of the crime immediately after the crime was committed. He gave explicit details to Cobb about the offense and told her he could not get a job because he "killed a man in Houston." Appellant also kept in contact with his mother in

4. The text of Tex.R.Crim.Evid., Rule 404(b) is as follows:

"Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident, provided, upon timely request by the accused, reasonable notice is given in advance of trial of intent to introduce in the State's case in chief such evidence other than that arising in the same transaction."

hopes of learning whether the police in Houston were looking for him, and took her advice not to return to Houston or his hometown of Taylor. "Evidence of flight is admissible as a circumstance from which an inference of guilt may be drawn." *Foster v. State*, 779 S.W.2d 845 (Tex.Cr.App. 1989). Like flight, the fact that appellant presented false identification to Officer Carlson when he was pulled over indicates a "consciousness of guilt" and an awareness that he needed to conceal his identity from law enforcement officials. Although producing false identification to a police officer may be evidence of a wrong act, which is not admissible to prove the character of a person to show that he acted in conformity therewith, it is admissible for other purposes such as proof of knowledge. Rule 404(b), supra. The trial court must be given due deference when deciding whether evidence has a "tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable" and therefore relevant under Tex.R.Crim.Evid., Rules 401, 402 and 403. *Montgomery*, supra. "The trial court must be given wide latitude to exclude, or, particularly in view of the presumption of admissibility of relevant evidence, not to exclude misconduct evidence as he sees fit." *Montgomery*, 810 S.W.2d at 390. The trial court may reasonably have believed the testimony was relevant to show appellant's knowledge that a crime had been committed and that he was a likely suspect. Point of error seven is overruled.

■ Appellant's eighth point of error alleges he was denied due process and equal protection under the law when the State was allowed to introduce into evidence an extraneous offense during the punishment phase of trial. Officer Carlson testified that after failing to verify appellant's drivers license, he asked appellant to step from the car, and as he did a "pistol slid from the front of the seat to the rear of the seat." Carlson arrested appellant for carrying a concealed weapon. After a hearing outside the presence of the jury, the trial court overruled appellant's objec-

tion and the testimony was admitted for its relevance to special issue two.

In support of this point of error, appellant complains that there was no clear showing he committed the offense of carrying a concealed weapon; there was no evidence of an adjudication of guilt; and there were no facts presented of the circumstances surrounding the charge. Appellant also alleges there was no showing of relevance and claims he was denied due process and equal protection of the laws under the Texas and United States Constitutions.

This Court has consistently held that the trial court may admit any evidence it deems relevant to sentencing at the punishment phase of a capital murder trial. See, e.g., *Briddle v. State*, 742 S.W.2d 379 (Tex.Cr. App.1987); *Turner v. State*, 698 S.W.2d 673 (Tex.Cr.App.1985); *Smith v. State*, 683 S.W.2d 393 (Tex.Cr.App.1984). Carlson provided direct testimony that appellant was in possession of a gun at the time he was arrested. Although there was no testimony regarding adjudication of guilt or circumstances of the charge, if any, that was unnecessary as long as the trial court deemed appellant's possession of the pistol relevant to one of the special issues. That appellant was carrying a gun arguably has some bearing on the question of whether he would pose a future danger to society. It was within the trial court's discretion to determine the evidence was relevant to special issue two, and absent a clear abuse of discretion this ruling will not be disturbed.

Appellant also alleges he was denied due process and equal protection under the United States and Texas Constitutions because different standards are used at the punishment hearing of a capital murder case versus a noncapital murder case. Appellant argues that the "unlimited admission of extraneous offenses during the punishment phase" denies him equal protection and due process of law, because the extraneous offense in the instant case would not have been admissible in a noncapital murder case. This Court has repeatedly held capital murder defendants are not denied equal protection under the law by the admission of such evidence. See, e.g., *Motley*

*v. State,* 773 S.W.2d 283 (Tex.Cr.App.1989); *Hogue v. State,* 711 S.W.2d 9 (Tex.Cr.App. 1986); *Nethery v. State,* 692 S.W.2d 686 (Tex.Cr.App.1985). Appellant's eighth point of error is without merit.

■ In his ninth point of error, appellant alleges it was error for the trial court to deny his request to restrict the prosecutor's cross-examination of appellant to only those matters covered by defense counsel during direct examination at the punishment phase. Specifically, appellant wanted to prevent the prosecutor from asking him whether he committed the capital murder for which he was on trial. Appellant concedes that once a defendant takes the stand he is subject to the same rules regarding cross-examination as any other witness. However, he alleges his privilege against self-incrimination is of such magnitude, that he should be able to exercise his right to testify without incriminating himself. We do not agree.

"The general rule is that if a defendant exercises his right to testify he is subject to the same rules governing examination and cross-examination as any other witness, whether he testifies at the guilt-innocence stage or at the punishment stage of the trial." *Cantu v. State,* 738 S.W.2d 249 (Tex.Cr.App.1987), citing *Brown v. State,* 617 S.W.2d 234 (Tex.Cr.App.1981). Appellant does not cite any authority to support his contention that he should not be cross-examined as to his guilt or innocence, but only asserts baldly that he has an overriding constitutional privilege, *viz:* his right against self incrimination. In *Cantu,* supra, this Court addressed a similar contention where appellant argued that he was being required to give up his right against self-incrimination if he was not allowed to limit the State's cross-examination. We held in that case that the trial court was correct in overruling appellant's request to limit his testimony and that the privilege against self-incrimination was not offended. See *Cantu,* 738 S.W.2d at 256. *Cantu*

is controlling. In Texas, the scope of cross-examination is wide open.[5] Once an appellant decides to testify at trial he opens himself up to questioning by the prosecutor on any subject matter which is relevant. Cross-examination about the offense itself would certainly be relevant to the first special issue, if nothing else. Appellant's privilege against self-incrimination was not violated when his motion to restrict cross-examination was overruled. Accordingly his twelfth point of error is overruled.

■ Appellant's first point of error alleges the evidence is insufficient to support the jury's affirmative finding in special issue two that there is a probability the defendant would commit criminal acts of violence that would constitute a continuing threat to society. In addition to the facts of the instant case, the State introduced three penitentiary packets at the punishment phase showing a conviction for burglary in 1966, and in 1969, and for burglary of a vehicle in 1963.[6] Edith Cobb testified that appellant told her he was breaking into apartments at night to steal televisions and stereos and that he carried a gun with him during these break-ins. Cobb also testified that appellant told her he robbed a local barber at gunpoint after receiving a haircut. Furthermore, Officer Carlson testified that appellant was concealing a gun underneath his seat when he was arrested.

The circumstances surrounding the murder were brutal, particularly in light of the fact that the victim was a quadriplegic. Appellant's history shows that he is an inveterate burglar with a propensity for carrying deadly weapons with him when engaging in that activity. "And though burglary is not necessarily a violent crime against a person, it is certainly pregnant with that potential." *King v. State,* 631 S.W.2d 486, 503 (Tex.Cr.App.1982) (emphasis in original). From the evidence adduced at trial the jury could reasonably conclude that appellant would constitute a continu-

---

**5.** Appellant refers to Tex.R.Crim.Evid., Rule 610(b), which states:

"A witness may be cross-examined on any matter relevant to any issue in the case, including credibility."

**6.** The instant offense was committed March 14, 1975.

ing threat to society. See *Burns v. State*, 761 S.W.2d 353 (Tex.Cr.App.1988). This point of error is overruled.

■ Point of error thirteen contends the trial court committed fundamental error in failing to adequately instruct the jury in considering all the particular mitigating evidence in answering special issue two. Additionally, appellant's second point of error in his supplemental brief claims that because he presented mitigating evidence with relevance beyond the scope of the special issues, a clarifying jury instruction was required. Because these two points are similar, they shall be considered together.[7]

In these consolidated points of error, appellant argues that the jury could not fully consider and give effect to mitigating evidence of appellant's actions in the fourteen years since the commission of the offense. At the punishment phase of trial, appellant introduced testimony by three Texas Department of Corrections Chaplains and a psychiatrist. Chaplain Timmons testified that he would see appellant approximately every week at religious services where he often volunteered to pass out literature. The chaplain never saw appellant exhibit any violent behavior and did not think he would commit acts of violence in the future. Chaplain Taylor testified that appellant attended services regularly every other week and would also help distribute materials. He also stated he was aware appellant held the position of "wing porter," which he believed was a position of trust. He never saw appellant exhibit any violent behavior, nor did he believe he would be violent in the future.

Chaplain Keppler testified that appellant was the most regular member of a small volunteer group which met once a week. During the course of these meetings, appellant would often participate in discussions and help other inmates discuss problems. He also testified appellant helped set up for services and had never known appellant to be violent, nor did he think he would commit acts of violence in the future. Dr.

Priscilla Ray, a psychiatrist, testified that she could not predict whether appellant would "commit criminal acts of violence that would constitute a continuing threat to society." She did state he was probably less likely now to commit acts of violence than in the past because he probably has better control of his impulses.

Appellant contends the trial court erred when it failed to instruct the jury how it could consider this evidence *when answering special issue two.* He believes this instruction was necessary pursuant to *Penry v. Lynaugh*, 492 U.S. 302, 109 S.Ct. 2934, 106 L.Ed.2d 256 (1989). However, *Penry* does not dictate that such an instruction be given. We have consistently held that the jury needs no special instruction to effectuate evidence to the extent it mitigates in the sense that it tends to show that special issues should be answered in the negative. See, e.g., *James v. State*, 805 S.W.2d 415, 417, n. 3 (Tex.Cr.App. 1990); *Quinones v. State*, 592 S.W.2d 933 (Tex.Cr.App.1980). Point of error thirteen is overruled.

The mitigating evidence which appellant contends required a special instruction was that of good deeds while in prison and religious devotion. Although this may constitute "mitigating" evidence under *Skipper v. South Carolina*, 476 U.S. 1, 106 S.Ct. 1669, 90 L.Ed.2d 1 (1986), its mitigating significance does not extend beyond the scope of the second special issue. See *Franklin v. Lynaugh*, 487 U.S. 164, 108 S.Ct. 2320, 101 L.Ed.2d 155 (1988) (O'Connor, J., concurring). Because the mitigating evidence could be given full consideration by the jury without the need for a special instruction, appellant's supplemental point of error two is overruled as well.

■ Appellant's third supplemental *point of error complains that the failure of the trial court to define the term "society"* in the second special issue left it unable to account for mitigating evidence in a constitutionally acceptable manner. Appellant argues that it is unclear whether "society"

---

7. The State contends appellant waived error by failing to object at trial. In light of this Court's

opinion in *Black v. State*, 816 S.W.2d 350 (Tex. Cr.App.1991), this argument is without merit.

refers to the prison population or society in general, or both. As a result of the prosecutor's argument that the prison population was excluded from "society," he argues, see *ante* at pp. 96–97, the jury could have been prevented from considering and giving effect to the mitigating evidence, *viz:* appellant's untainted fourteen year prison record since the commission of the offense.

Appellant failed to request a definition of "society" in the punishment charge. He now complains that without such a definition the jury was not equipped to consider the relevance of his good conduct in prison *as it relates to the second special issue.* As we have already made clear, however, a request that the jury be told how to apply evidence that militates in favor of a negative answer to special issues is *not* in the nature of a *Penry* instruction. See *James v. State,* 805 S.W.2d at 417, n. 3; *Quinones v. State,* supra. Cf. *Franklin v. Lynaugh,* supra, (good disciplinary record in prison *only* has mitigating significance *vis-a-vis* the second special issue). Therefore, our holding in *Black v. State,* 816 S.W.2d 350 (Tex.Cr.App.1991), that *Penry* error need not be preserved by request or objection, does not apply to the instant claim. Because appellant did not request a definition of "society," we must measure the trial court's failure to give such an instruction against the test for fundamental jury charge error enunciated in *Almanza v. State,* 686 S.W.2d 157 (Tex.Cr.App.1985) (Opinion on State's motion for rehearing).

In *Caldwell v. State,* supra, we held that even upon *request,* it was not error to fail to define "society," reasoning that by virtue of common understanding of that term "the jury would clearly focus its attention on the society ... within the Department of Corrections." *Caldwell,* 818 S.W.2d at 798, quoting *Rougeau v. State,* supra, 738 S.W.2d at 660. In the premises, we could hardly now hold that failure to so instruct the jury *absent* a request constitutes egregious error under *Almanza.* Appellant's third supplemental point of error is overruled.

 Appellant's final supplemental point of error alleges Article 37.071, V.A.C.C.P. violates the Eighth and Fourteenth Amendments to the United States Constitution because it achieves a verdict through misinformation and artifice. Specifically he claims that jurors should be informed, contrary to Article 37.071(g), V.A.C.C.P., that failure to reach a verdict of either "yes" or "no" on any one of the special issues will automatically result in the imposition of a life sentence. Appellant did not object at trial to the lack of such an instruction, nor did he submit a requested instruction to that effect. Even assuming appellant has preserved this claim for appeal, this Court has rejected it on the merits in *Draughon v. State,* 831 S.W.2d 331, 337 (Tex.Cr.App.1992) and *Davis v. State,* 782 S.W.2d 211, 221 (Tex. Cr.App.1989). This point of error is overruled.

The judgment of the trial court is affirmed.