COURT OF APPEALS









COURT
OF APPEALS

EIGHTH
DISTRICT OF TEXAS

EL
PASO, TEXAS

 

CHARLES EDWARD TURNER,                         )

                                                                              )              
No.  08-03-00274-CR

Appellant,                          )

                                                                              )                    Appeal from the

v.                                                                           )

                                                                              )                
358th District Court

THE STATE OF TEXAS,                                     )

                                                                              )             
of Ector County, Texas

Appellee.                           )

                                                                              )                   (TC# D-30,243)

                                                                              )

 

 

O
P I N I O N

 

Appellant Charles
Edward Turner appeals his murder conviction. 
A jury found Appellant guilty of murder and assessed punishment at 25
years=
imprisonment.  In his sole issue on
appeal, Appellant contends the trial court erred in overruling his objection to
the State=s
improper jury argument.  We affirm.








On the evening of
July 29, 2002, Detective Buzzy Abalos of the Odessa Police Department received
a call to investigate a homicide at the Spanish Oaks Apartments Complex in
Odessa.  Police officers were already at
the scene when Detective Abalos arrived and he learned that the victim,
eighteen-year-old Christopher Blair, had been shot and pronounced dead on
arrival at the hospital.  Detective
Abalos was also informed that the police had two suspects in custody, one of whom
was Appellant.  By the time Detective
Abalos had arrived, Texas Ranger Jess Malone had interrogated Appellant and
Appellant had admitted that he had shot Blair. 


Suzanne Drennan,
Blair=s mother,
made several visits to Blair=s
apartment on July 29.  Her youngest son,
D.D., had called her at 4:30 in the morning, asking her to pick him up because
Blair and Blair=s
girlfriend were arguing.  Ms. Drennan
returned a second time at 10:30 a.m. after receiving a call from the
girlfriend.  The girlfriend was concerned
that Blair had taken too many Xanax.[1]  After talking with Blair for about an hour,
they left together to pick up Blair=s
girlfriend and then returned to the apartment around 2 p.m.  Blair left twice when Ms. Drennan was
there.  Ms. Drennan left about 6 p.m. to
pick up her youngest son at her house and then returned to Blair=s apartment at 8 p.m.  Ms. Drennan saw Blair walking from an
apartment on the west side of the complex. 
He appeared to be walking straight, upright, and very calm.  Ms. Drennan stayed until 9:30 p.m.








At 9:51 p.m., Ms.
Drennan=s friend
called her and told her that Blair was out in the middle of the parking lot
with knives.  Within twenty minutes, Ms.
Drennan returned to Blair=s
apartment complex.  Blair entered his
apartment and Ms. Drennan followed behind him. 
Ms. Drennan learned from her friend that her son was being accused
of breaking into an apartment.  Blair
quickly walked out of the apartment to the south side of the apartment complex,
with Ms. Drennan=s friend
following behind.[2]  Blair then went back to his apartment, but
before he reached the front door of the apartment, Ms. Drennan heard him say AI will cut up every one of you n**s.@ 
Blair and the friend entered the apartment and Ms. Drennan pulled the
screen door closed.  Ms. Drennan had her
back turned when she heard her youngest son say, AHe=s got a gun.@  As soon as she turned, she saw a black man at
the screen door and heard him say, AI
am not f** playing with you.@  Ms. Drennan identified Appellant as the man
she had seen at the door.[3]  Ms. Drennan lost sight of Appellant when he
walked out of the light above the door. 
Ms. Drennan could not see or hear Blair from where she was standing
in the apartment.  Within moments, her
son exited the apartment and she heard gunshots.  Ms. Drennan left the apartment and saw that
her son had been shot in the chest and was laying on the ground in the parking
lot.  According to Ms. Drennan=s friend, Appellant shot Blair as Blair
was trying to back away from him.

Police officers
recovered a large kitchen knife in front of Blair=s
residence.  They also found some Xanax
outside Apartment Number 12, which was Appellant=s
residence.  At the hospital, officers
found a butterfly knife in Blair=s
pants pocket.  Detective Abalos testified
that the butterfly knife is an illegal weapon.








According to
witnesses, there had been an earlier confrontation between Appellant and Blair
about half an hour before the shooting. 
In that confrontation, amid much cursing and shouting, Appellant claimed
that Blair had stolen his money and his Astuff.@ 
Blair denied the accusations. 
Witnesses saw Blair yelling and swinging a butterfly knife around.  Blair stated that he was going inside to get
a gun, but returned with a kitchen knife. 
Blair said Ahe was
going to kill all those n**s@
and everyone who had been watching the argument went inside their
apartments.  Appellant and another black
man were then seen leaving the apartment complex in a car.  Blair remained outside yelling in the parking
lot and walking around with the knives.

About fifteen to
twenty minutes later, witnesses observed the second and fatal confrontation
between Appellant and Blair.  Witnesses
saw Appellant and Wilburn return to the apartment complex.  They exited the car and Wilburn walked to his
cousin=s
apartment, but Appellant opened the trunk of the car, pulled out a gun, and
started walking toward Blair=s
apartment.  Witnesses heard Appellant
racking a round into the gun chamber. 
Blair was coming out of his apartment as Appellant approached.  Blair did not display the butterfly knife,
but did have the kitchen knife.  They
began arguing again about Blair allegedly stealing Appellant=s Astuff@ and Appellant was repeatedly heard
saying that Ahe wasn=t playing@
with Blair.  One witness heard Appellant
state, AI=ll kill you@
to Blair.  Blair started walking between
the parked cars, and according to one witness, Blair put down the kitchen knife
by a tire.  Appellant followed Blair to
the middle of the parking lot and then shot him.  One witness testified to hearing Appellant
say, AI killed
his ass@ as he
stood over the body.








Appellant was
later apprehended in the apartment of another resident in the complex.  Later that evening, Texas Ranger Jess Malone
interviewed Appellant.  During the taped
interview, Appellant stated that he lived in Apartment Number 12, and earlier
that day, he had been drunk and had fallen asleep.  He was awoken by friends who told him that AChris@
from Apartment Number 14 had been rummaging through his apartment while he was
asleep.  Money was missing from Appellant=s pockets.  Appellant also stated that Astuff@
was missing.  Appellant confronted Blair
and he pulled out the butterfly knife. 
According to Appellant, Blair threatened to stab him.  Appellant left with a friend, but later came
back with a gun and asked about his money again.  Blair had the knives and came towards
Appellant.  Appellant admitted that he
shot Blair during their argument.

Appellant=s friend, Marquette Wilburn, testified
that both his cousin and Appellant lived in the Spanish Oaks Apartment Complex
on July 29.  He witnessed the two
confrontations between Appellant and Blair. 
Appellant confronted Blair, but Blair denied breaking into Appellant=s residence.  Wilburn called Appellant away when Blair
pulled a knife out of his back pocket. 
He and Appellant talked by the side of the apartment building for ten to
fifteen minutes.  They then walked around
the building to where the confrontation had occurred.  Wilburn walked to his cousin=s apartment and as Appellant made his
way back to his apartment, Blair came back outside.  Wilburn denied leaving the area in a vehicle
after the first confrontation and denied any knowledge about the firearm or how
Appellant had acquired it.

In his sole issue,
Appellant argues that the trial court erred in overruling his objection to the
prosecutor=s remarks
during closing argument, which he asserts were outside the record.  During closing argument, the prosecutor
stated: 

He [Blair] had no business talking the
way he talked about other citizens.  But
that didn=t give
anybody on this earth the right to murder him. 
Nobody had the right to kill him over what he said.  And even if he was in the other boy=s apartment, that didn=t give Charles the right to go and kill
him.  Even if he stole his money or his
drugs.








Defense counsel objected, arguing
that the reference to stealing drugs was outside the record.  At first, the trial court sustained the
objection, but after the State argued that there was evidence that Blair had
stolen Appellant=s Astuff, money, or drugs,@ the trial court reversed its ruling and
overruled the objection.  Appellant
argues on appeal that there was no evidence introduced at trial that indicated
he believed Blair had stolen his drugs.

It is well settled
that proper jury argument must fall within one of the following four
categories:  (1) summation of the
evidence; (2) reasonable deduction from the evidence; (3) answer to argument of
opposing counsel; and (4) plea for law enforcement.  See Felder v. State, 848 S.W.2d 85,
94-95 (Tex.Crim.App. 1992)(en banc); Calderon v. State, 950 S.W.2d 121,
133 (Tex.App.--El Paso 1997, no pet.). 
Wide latitude is given to counsel in drawing inferences from the
evidence provided the inferences are reasonable, fair, legitimate, and offered
in good faith.  Denison v. State,
651 S.W.2d 754, 761-62 (Tex.Crim.App. 1983)(en banc).








In the present
case, several witnesses testified that Appellant believed Blair had broken into
his apartment and taken his money and his Astuff.@ 
In his taped statement to police, Appellant stated that he was awaken by
friends who told him that Blair had been inside his apartment while he was
asleep.  Money was missing from Appellant=s pockets.  Appellant also stated that Astuff@
was missing without further elaboration. 
Ms. Drennan testified that Blair was high on Xanax throughout the day
and a Xanax-type drug was detected in Blair=s
system.  The police found Xanax outside
Appellant=s
residence.  While there was no direct
evidence that Appellant believed that in addition to money, Blair had taken his
drugs, it was a reasonable deduction from the evidence to argue that Blair
could have stolen money or drugs from Appellant.  Thus, the trial court did not err in
overruling Appellant=s
objection because the prosecutor=s
remarks are within the bounds of proper argument.

Assuming arguendo
that the prosecutor=s remarks
were improper jury argument, we would nevertheless find that the error was
harmless.  If a jury argument exceeds the
bounds of proper argument, the trial court erroneous ruling of a defendant=s objection is not reversible error
unless it affected his substantial rights. 
Tex.R.App.P. 44.2 (b); Martinez
v. State, 17 S.W.3d 677, 692-93 (Tex.Crim.App. 2000); Mosley v. State,
983 S.W.2d 249, 259 (Tex.Crim.App. 1998) (Op. on reh=g).  We employ three factors to determine whether
the improper jury argument demands reversal: 
(1) the severity of the misconduct (the magnitude of the prejudicial
effect of the prosecutor=s
remarks); (2) the measures adopted to cure the misconduct (the effect of any
cautionary instruction given by the court); and (3) the certainty of conviction
absent the misconduct (the strength of the evidence supporting the
conviction).  Threadgill v. State,
146 S.W.3d 654, 666-67 (Tex.Crim.App. 2004); Martinez, 17 S.W.3d at
692-93. 

Here, the first
factor does not weigh very heavily in Appellant=s
favor.  The misconduct, if any, was not
particularly severe.  Appellant argues
that the statement undermined his 








self-defense theory and introduced
extraneous acts evidence.  However, it is
undisputed that Appellant believed at the very least that Blair had taken money
and Astuff@ from Appellant-- evidence which would
have likewise undermined his self-defense theory.  Further, the prosecutor=s remarks would not have necessarily
led the jury to speculate that Appellant was dealing drugs.  With regard to the second factor, we find it
weighs in favor of Appellant because no curative action was taken by the trial
court.  The third factor, however, weighs
very heavily in favor of the State. 
After reviewing the entire record, we believe that conviction was
certain, particularly given Appellant=s
admission, physical evidence recovered from the scene, and witnesses= testimony.  Given the mildness of the prosecutor=s remarks and the strength of the State=s case, we would find the error, if
any, was harmless.  Appellant=s sole issue is overruled. 

We affirm the
trial court=s
judgment.

 

 

 

 

May
7, 2005

DAVID WELLINGTON
CHEW, Justice

 

Before Barajas, C.J., McClure, and Chew, JJ.

 

(Do Not Publish)











[1]
Ms. Drennan testified that on that day, Blair was high on Xanax, an
anti-anxiety narcotic and downer.  Blair
did not have a prescription for Xanax and she believed he had obtained the
drugs from someone else.  The toxicology
report confirmed the presence of benzodiazepine, an anti-depressant
anti-anxiety medication sold under the trade name Xanax, in Blair=s system, along with traces of
marijuana and cocaine.  





[2]
According to Ms. Drennan=s
friend, Appellant confronted Blair with a gun, demanding that Blair give him
back his Astuff.@ 
The friend did not know to what Astuff@ Appellant was referring.  





[3]
On cross-examination, Ms. Drennan also testified that Appellant came to Blair=s apartment between 2 p.m. and 4 p.m.,
asking for a ride to the store.  Neither
she nor the girlfriend would give him a ride. 
Appellant asked Blair as well, but Ms. Drennan had taken the car keys
from him and told Appellant that Blair was a little high.