

# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
### FORT WORTH

NO. 2-08-337-CR

THOMAS GREGORY MARSHALL                                      APPELLANT

V.

THE STATE OF TEXAS                                                  STATE

------------

FROM THE 415TH DISTRICT COURT OF PARKER COUNTY

------------

## MEMORANDUM OPINION[1]

------------

### I.  Introduction

In two points, appellant Thomas Gregory Marshall appeals the sentence imposed by the jury after he pleaded guilty to, and was convicted of, felony DWI.  We affirm.

---

[1] *See* Tex. R. App. P. 47.4.

## II.  Factual and Procedural History

On May 17, 2007, at approximately 1:30 p.m., Captain William Ray of the Willow Park Police Department received a dispatch about a possibly intoxicated driver.  Upon reaching the designated intersection, he saw a gray car traveling on the wrong side of the road after it apparently ran a pick-up truck off the highway.[2]  After he activated his lights and siren in an attempt to stop the vehicle, it continued to drive for approximately one mile, crossing over the road's center line at least twice and traveling between forty-five and fifty miles per hour in a thirty-five mile-per-hour zone.  Marshall was the vehicle's driver and sole occupant.

---

[2]... Captain Ray testified as follows:

Q.    What happened after you turned north on Ranch House [Road]?

A.    . . .  When we entered the left-hand corner, I observed a pickup truck coming south on Ranch House [Road] coming back onto the roadway.  Grass—you could see the grass and the dust coming up from the shoulder.  I also observed a gray vehicle in front of another car that was coming back over onto the right-hand side of the roadway.

Q.    That had been traveling on the incorrect side of the road?

A.    Yes, sir.

2

Captain Ray administered a Horizontal Gaze Nystagmus test, which Marshall failed. Captain Ray arrested Marshall for the investigation of DWI and transported him to the Parker County Jail to administer the intoxilyzer and other sobriety tests on videotape.[3] Marshall failed three additional sobriety tests. He refused to provide a breath sample for the intoxilyzer. Captain Ray obtained a search warrant for a sample of Marshall's blood. The blood test revealed that Marshall had a blood alcohol concentration of .33.[4]

Marshall pleaded guilty to felony DWI, admitted to three prior misdemeanor DWI convictions, and asked the jury to assess his punishment. Marshall testified at trial and called eight character witnesses in support of his request for community supervision. At the close of evidence, the jury assessed punishment at five years' confinement and a $10,000 fine. The trial court denied Marshall's motion for new trial, and this appeal followed.

### III. Motion for New Trial

In his first point, Marshall complains that the trial court abused its discretion by denying Marshall's motion for new trial "because substantial

---

[3] ... The videotape of the sobriety tests was admitted into evidence and published to the jury.

[4] ... A person is legally intoxicated if his blood alcohol concentration is 0.08 or more. Tex. Penal Code Ann. § 49.01(2)(B) (Vernon 2003).

evidence that could have benefitted [Marshall] at sentencing was not presented to the jury."

A. Standard of Review

We review a trial court's denial of a motion for new trial under the abuse of discretion standard. *State v. Herndon*, 215 S.W.3d 901, 906–07 (Tex. Crim. App. 2007). We do not substitute our judgment for that of the trial court; rather, we decide whether the trial court's decision was arbitrary or unreasonable. *See id.* at 907–08.

Marshall based his motion for new trial "in the interest of justice." The court of criminal appeals has spoken at length regarding the granting of a new trial "in the interest of justice":

> Historically, we have consistently held that a trial judge has the authority to grant a new trial "in the interest of justice" and that his decision to grant or deny a defendant's motion for new trial is reviewed only for an abuse of discretion. That discretion is not, however, unbounded or unfettered. A trial judge has discretion to grant or deny a motion for new trial "in the interest of justice," but "justice" means in accordance with the law.
>
> A trial judge does not have authority to grant a new trial unless the first proceeding was not in accordance with the law. He cannot grant a new trial on mere sympathy, an inarticulate hunch, or simply because he personally believes that the defendant is innocent or "received a raw deal." The legal grounds for which a trial court must grant a new trial are listed in Rule 21.3, but that list is illustrative, not exclusive. A trial court *may* grant a motion for new trial on other legal grounds as well. . . . Although not all of the grounds for which a trial court may grant a motion for new

4

trial need be listed in statute or rule, the trial court does not have discretion to grant a new trial unless the defendant shows that he is entitled to one under the law. To grant a new trial for a non-legal or legally invalid reason is an abuse of discretion. . . .

While a trial court has wide discretion in ruling on a motion for new trial which sets out a valid legal claim, it should exercise that discretion by balancing a defendant's "interest of justice" claim against both the interests of the public in finality and the harmless-error standards set out in Rule 44.2. Trial courts should not grant a new trial if the defendant's substantial rights were not affected. Otherwise, the phrase "interest of justice" would have no substantive legal content, but constitute a mere platitude covering a multitude of unreviewable rulings. . . .

We need not today set out bright-line rules concerning appellate review of a trial court's discretion in this area, but we do conclude that a trial court would not generally abuse its discretion in granting a motion for new trial if the defendant: (1) articulated a valid legal claim in his motion for new trial; (2) produced evidence or pointed to evidence in the trial record that substantiated his legal claim; and (3) showed prejudice to his substantial rights under the standards in Rule 44.2 of the Texas Rules of Appellate Procedure. The defendant need not establish reversible error as a matter of law before the trial court may exercise its discretion in granting a motion for new trial. On the other hand, trial courts do not have the discretion to grant a new trial unless the defendant demonstrates that his first trial was seriously flawed and that the flaws adversely affected his substantial rights to a fair trial.

*Id.* at 906–09 (internal citations omitted).

B. Evidence

Marshall complains that at the hearing conducted on his motion for new trial, he produced evidence that was not presented to the jury during his trial through no fault of his. Specifically, he argues that he, his wife, Greg Kemp,

5

James Runyon, Lavell Ellis, Rocky Rogers, Charles Fisher, Tom Campbell, and Edward Deary either were not available to testify at trial because of short notice from his trial counsel or were not adequately prepared and questioned during trial by his trial counsel.

Marshall, his wife, Rogers, Fisher, Campbell, and Deary testified at trial, as did Larry Adams (one of Marshall's friends), Ed Judge (Marshall's probation officer), and Steve Markwardt (Marshall's AA sponsor). The trial testimony centered on Marshall—his education (associate degree in mechanical engineering, bachelor of business administration degree, master of science degree in engineering, and a master of business administration degree), his personality traits (his honesty and integrity, his self-reliance, his excellent leadership and management skills, and his reputation as a hard worker), his family (wife, two daughters—one in high school and one in college—an elderly aunt, his recently deceased father), and his work history with Bell Helicopter and as a consultant. It also centered on what his family and friends were willing to do to help him comply with the terms and conditions of community supervision.[5]

---

[5] Marshall's character witnesses, most of whom had known him for many years, testified that they would assist him in following the terms and conditions of community supervision.

Marshall's wife D.D. testified that she had been married to Marshall for almost twenty-three years, that they enrolled him in Baylor All Saints Hospital's in-depth treatment program after his arrest, and that Marshall has been in compliance with all his bond requirements (i.e., treatment programs, his ankle bracelet, weekly probation meetings, etc.). About Marshall, she testified that "[h]e's a good all-around guy period . . . ; he's the type of guy that would give you the shirt off his back." With regard to the changes she had noticed in Marshall, she testified:

> It's . . . the AA program has been the major turnaround. But, again, I do want to emphasize that it's not AA on the surface. It's AA penetrated. And we stumbled a little bit trying to get there because we thought we were doing the right things, but . . . you have to really get involved. It's like attending church and—and never volunteering or something. We had to really get involved, come to a new level, a different understanding. It wasn't just about, oh, he's going to show up and he's going to get better one day or it's—things are going to be—our life is going to be different. When we found the right sponsor, which was the key thing as well, things really started to turn around because our activities in the church had a new connection to the sponsor.

She testified that she would help Marshall comply with the terms and conditions of community supervision if he were to receive it.

Marshall testified that he was fifty years old and that his father had also been an alcoholic. He testified that he had completed an inpatient detoxification program as well as intensive outpatient services and had secured

7

a prescription for Antabuse from his family physician. Marshall credited his wife with helping him to ask for help this time, and he testified about the various programs he was enrolled in, including Alcoholics Anonymous. He also gave the following direct testimony:

Q. Why haven't you solved this [alcoholism] problem before today?

A. I think this is the mind-set that I've had for my whole life. And I've always thought that I could control things, that I had to control things, and I didn't feel like I should seek help. . . . [I]t was pride.

. . . .

Q. [W]hy is this time any different than the others? I mean, it's easy to say that you've gone through, you know, hundreds and maybe thousands of hours of programs. Why should this jury extend you an opportunity to continue these things as opposed to sending you to the penitentiary?

A. . . . Once I was, I guess, finally able to believe that this is truly something that I don't have control over, which I—which I need to be in control—it's something that exceeds my . . . finite limitations. . . . Once I learned that and humbled myself and—and what D.D. said was right. In previous times going to AA and stuff, it was just an exercise. It's just like, you know, yeah, I got to be here. And after a while the stories are the same; it's just maybe different people. And, well, that's not me because I still get up and go to work and—and I still bring home this and—and it's just false hope. But like, again, she stated, if you get into the thing, it works. I—I kind of thought it would never work on me. Again, I—this is about me. But I've had to really humble myself. Started in the treatment, started with my wife, and it's—it's just crazy. . . . I can't believe I have put my family in this position, and my friends.

8

On cross-examination, he added:

Like I said before, . . . I didn't get it in the past. I've totally been humbled by this. . . . I've admitted I do need help finally. Tried to get some spiritual stuff back in my life and back in my family. My wife and kids . . . they're still here for me. I—I love them to death. I'm sorry to put everybody through this. I—but I think in the end it will be the best thing that ever happened to me and my family. I owe them a lot. I owe my friends. And I've let them down. And I look forward to the future. I'm—I'm an honest person. I feel like that. And they have a reason to question my—the trust that we've built over the years, and—and I want to build that back. We're doing that now. D.D. and I are happier, you know, within reason, as much as we have been in I don't know how long. My—my girls are coming around. And, yeah, there's a dad now that—you know, they're 18 and 15, you know . . . . I owe it to them. I—and I'm looking forward to paying them back.

The testimony at the hearing on the motion for new trial and in the affidavits filed during that hearing added no new information. Marshall testified that his participation in the various programs "[was] totally different this time," that he was sorry he had let so many people down, and that he regretted not getting to tell the jury the differences between the relationship with his wife as compared to the previous DWIs.[6] His wife testified that his commitment to

---

[6] ... During the motion hearing, he testified as follows:

Q.     Now, did you get a chance to—to tell the jury at your trial the—the differences in the relationship with—between you and your wife now as compared to your prior DWIs?

A.     No.

9

treatment now was very different from his earlier DWI cases, that he had overcomplied with his bond requirements, and that he would lose his family if he started drinking and driving again.[7]  Lavell Ellis, a licensed chemical

Q.     And is that an important component, in your opinion, in—in making sure that you're not going to be out drinking and driving?

A.     It—it is.  It is major.  It is a major component.

Q.     And are you committed to continuing with treatment and AA in the future?

A.     I'm very committed.  And, as funny as this may sound, I—I look forward to the future for that because I've got a little taste of helping some people, and I sure have the history to know what not to do . . . .

He also added that, in his previous experience with AA, he did not really have a sponsor and went through the required steps rather quickly without "exercising the intent of the program."  This time, he had been in AA for approximately sixteen months and was on the twelfth step of the program.  This time, he had Markwardt, Ellis, Judge, and his wife as a support group.  This testimony generally duplicated trial testimony by Fisher, Judge, Deary, Adams, Markwardt, D.D., and Marshall himself.

[7]... D.D. additionally testified that she had noticed a significant difference in Marshall following his arrest in this case as compared to his behavior and attitude following probation for his prior DWI offenses in that what he does on his own now is voluntary.  She testified that while he previously attended the DWI Education Class and some AA classes, he never made the right connection after the third DWI, and she was not able to truly help him with recovery because she mistakenly believed that he could simply will himself to stop drinking and did not understand that alcoholism is a disease.  This time, she was able to effectively help Marshall maintain his sobriety, and their relationship had become stronger and healthier as a result of Marshall's commitment to sobriety.  Overall, Marshall's commitment to treatment is now very different from his prior DWI cases, and he now has a safety net in place that was not

10

dependency counselor, testified that Marshall had voluntarily participated in one of his group classes for almost a year and was "a pretty committed man, I think." Ellis testified that, of his fifty-five clients, he considered Marshall to be the lowest risk of reoffending because he seemed to be the most committed, but he also testified that by "low risk," he was talking about "probably less than five-percent chance of relapse," and that he did not know what Marshall's blood alcohol content was when he was arrested. And Gregory Kemp, who had known Marshall for thirty-four years, testified that Marshall was a good family man and a good husband, that he was Kemp's children's godfather, and that he had a new commitment to the programs that he had not had in the past.

Marshall offered into evidence affidavits from four character witnesses who testified at trial. Deary's affidavit stated that the jury should have heard more about Marshall as a person rather than about his professional background and economic status, that Marshall was truly taking responsibility for his problem with alcohol, and that Marshall was now devoting his time to people that support him and will help keep him out of trouble. Rogers's affidavit stated that Marshall has a great relationship with his daughters and that "[t]his

---

available following his prior DWI arrests. This testimony generally duplicated trial testimony by Fisher, Judge, Deary, Adams, Markwardt, Marshall, and D.D. herself.

11

situation" had brought Marshall and D.D. closer together; it also stated that the jury should have heard more about Marshall personally, rather than about his education and profession, including how Marshall handled his father's illness and changing needs prior to arrest, his aunt's death and estate, and relocation of another elderly aunt. Fisher's affidavit stated that he felt he did not get the chance to emphasize for the jury that Marshall was willing to do anything he needed to recover from his alcohol problem, that Marshall was remorseful, and that Marshall has been doing community service, including rebuilding houses in Galveston. Campbell's affidavit stated that Marshall had "truly found 'religion' in dealing with his drinking problem," has a closer relationship with his family since his arrest, and has made a "truly profound" change, and that jail time was not necessary and would not help Marshall recover.

Marshall offered into evidence affidavits from three additional character witnesses, Greg Kemp, James Runyon, and Lavell Ellis. Kemp's affidavit stated that Marshall did not belong in prison and that Marshall was remorseful and "definitely realizes what a bad and stupid thing it is to drive while intoxicated." Runyon's affidavit stated that Marshall recognized that the arrest was his fault and that he takes it very seriously, that Marshall handled stress from family and work responsibilities the wrong way by drinking, and that Marshall had much to offer the community. Ellis's affidavit stated that Marshall was in one of his

12

treatment groups, was very serious about getting treatment for his alcohol abuse problem, did not belong in prison, and presented a low risk of reoffending if he continued his involvement with AA and continued to follow a treatment program. All of this evidence essentially duplicates testimony admitted at trial by Judge, Deary, Adams, Markwardt, D.D., and Marshall himself.

At the conclusion of the testimony at the hearing, the trial court observed:

> Well, candidly—and correct me on this if I'm mistaken, but, really, the only variant—the only objectively assessed variance that we have with the evidence at trial is simply that Mr. Ellis testified here today and did not at trial, and otherwise, the subject matter covered . . . seems to be consistent. . . . It's just that his personal presence wasn't here . . . but other than that . . . the area was covered.

The trial court denied the motion.

C. Analysis

After reviewing the record before us, we hold that the trial court did not abuse its discretion by denying a motion for new trial. The vast majority of the alleged "should-have-been-offered" testimony presented at the hearing duplicated trial testimony, and we cannot say that the testimony that purportedly would have been offered demonstrates that a seriously flawed trial occurred or that Marshall's substantial rights were affected. *See Herndon*, 215 S.W.3d at 906, 909. We overrule Marshall's first point.

13

### IV. Jury Argument

In his second point, Marshall complains that the trial court erred by not sustaining his objection during closing arguments.

### A. Closing Arguments

The following dialogue occurred during the State's rebuttal:

[State]: What [defense counsel] is asking you to do—the real base question that you have to ask yourself is, ["D]o I trust Thomas Gregory Marshall? Do I trust that if I don't take the opportunity and put him where he can't drink and drive, that he will not engage in that activity?["] And I think you've got to reach inside of yourself and look and say, ["Y]ou know what, what's his track record?["] Folks, I would submit to you his track record is DWI, probation, goes to programs, gets some help; DWI, probation[,] goes to programs, gets some help; DWI. And, folks, kind of one of the scariest parts to me, too, is that while he's not the alcoholic in the sense that we see that word or you go to the movies and see somebody drinking constantly and falling over, he goes out socially, a couple times a week and has some drinks. In Bedford 30 miles away. And you heard some of the witness' testimony he drives himself home. That ought to scare you. That ought to scare you that this defendant gets up and says, ["Y]ou know what, oh, I may still have a few [e]ffects of—from the night before because I drank some then, too, but went ahead and drove to work and, no, I've got no recollection of running anybody off the road.["] *But we know the facts of this case are he was driving so badly, that someone called in—a complainant called in to the Willow Park Police Department dispatch and made that complaint.*

[Defense counsel]: Your Honor, I think the Counsel is outside the record, your Honor. The Court will recall—

[State]: Judge, that's directly based on testimony. They can recall it as they will.

[Defense counsel]: I'll object—

[Trial Court]: Overruled.  [Emphasis added.]

B.  Standard of Review

To be permissible, the State's jury argument must fall within one of the following four general areas:  (1) summation of the evidence; (2) reasonable deduction from the evidence; (3) answer to argument of opposing counsel; or (4) plea for law enforcement.  *Felder v. State*, 848 S.W.2d 85, 94–95 (Tex. Crim. App. 1992), *cert. denied*, 510 U.S. 829 (1993); *Alejandro v. State*, 493 S.W.2d 230, 231 (Tex. Crim. App. 1973).  If a jury argument exceeds the bounds of proper argument, the trial court's erroneous overruling of a defendant's objection is not reversible error unless it affected the appellant's substantial rights.  Tex. R. App. P. 44.2(b); *Martinez v. State*, 17 S.W.3d 677, 692–93 (Tex. Crim. App. 2000); *Mosley v. State*, 983 S.W.2d 249, 259 (Tex. Crim. App. 1998) (op. on reh'g), *cert. denied*, 526 U.S. 1070 (1999).  In determining whether the appellant's substantial rights were affected, we consider (1) the severity of the misconduct (i.e., the prejudicial effect of the prosecutor's remarks), (2) curative measures, and (3) the certainty of the punishment assessed absent the misconduct.  *Martinez*, 17 S.W.3d at 692–93; *Mosley*, 983 S.W.2d at 259.

15

C. Analysis

Marshall argues that the State injected harmful facts into the case without support in the record, stating,

> Simply put, nothing in the testimony from the trial indicated that the complainant witnessed any "bad driving" on behalf of Appellant. Instead, the only testimony on the issue indicated that the call was for a "possible intoxicated driver" which does not speak to what factor(s) were witnessed that led the caller to believe there was a possibility that the driver was intoxicated.

Captain Ray gave the following testimony during the State's direct examination:

> Q. Okay. At approximately 1:30 on that Thursday, May 17th, did you receive a dispatch?
>
> A. Yes, sir.
>
> Q. And where was that dispatch received from?
>
> A. The Willow Park dispatch.
>
> Q. What was the nature of that dispatch?
>
> A. They had received a call of a possible intoxicated driver on Ranch House Road northbound.
>
> Q. Did you have any d[e]scription of what kind of car it was?
>
> A. Yes, sir. They advised it was a gray—a gray vehicle. They didn't—I don't believe the complainant advised what type of vehicle. It was a gray—gray car.

16

Notwithstanding Captain Ray's direct testimony, Marshall gave the following testimony on cross-examination:

Q. Did you give any thought to the fact that you were intoxicated before you got in that car to drive that, what is it, 30 miles from Bedford to Willow Park?

A. I honestly can't say. I—I'm—I'm—I knew I didn't need to drink anymore and I needed to go about my plan for the day.

Q. *Does it concern you that you were driving so badly, that someone called in on a cell phone to a police department and said, hey, you need to look out for this gray Volvo?*

A. . . . [W]hat was described earlier, *I think it was overstated. I—it—it concerns me, yes, but I don't recall running anybody off the road at all.*

[Defense]: Your Honor, we object. There's no testimony from any officer of that occurring.

[Trial court]: Sorry?

[Defense]: We're going to object to that. There's no testimony from any of—the witness stand of any of the things he said occurring. If he wants to put a witness up—

[Trial court]: Overruled. [Emphasis added.]

Marshall does not complain on appeal about this objection being overruled.

Assuming, without deciding, that the trial court erred by not sustaining Marshall's objection to the State's controversial statement in closing arguments, we first consider the prejudice, if any, caused by the improper remark. *See Hawkins v. State*, 135 S.W.3d 72, 77 (Tex. Crim. App. 2004)

17

("Prejudice is clearly the touchstone of the first factor in the *Mosley* test."). The statement was made a single time, without elaboration, emphasis, or subsequent direct or indirect reference, and the subject matter of the statement itself was not inflammatory or egregious. This factor weighs in favor of the State. However, no curative measures were taken because Marshall's objection was overruled, and this factor weighs in Marshall's favor. Finally, however, it is with regard to the certainty of the punishment assessed absent the misconduct that we conclude that the error did not affect Marshall's substantial rights. *See* Tex. R. App. P. 44.2(b).

First, the jurors could have reasonably deduced for themselves that Marshall was driving "badly," given that his blood alcohol content was more than four times the legal limit; given Captain Ray's testimony about Marshall's driving and his performance on the sobriety tests, and the publication of the sobriety test videotape; and given Marshall's testimony that he did not recall running anybody off the road (contrary to Captain Ray's testimony).

Second, Marshall admitted to three prior convictions for DWI—in 1991, 1994, and 1999—two of which also involved charges for possession of marijuana, although at least one of the possession charges was dropped in

18

exchange for a guilty plea to the DWI charge.[8]  Deary, one of Marshall's character witnesses, admitted on cross-examination that it was worse that someone could be caught three times for DWI and continue to do it.  Rogers, another of his character witnesses, stated on cross-examination that he thought Marshall recognized back during the prior DWIs that he had an alcohol problem.

Finally, the punishment assessed—five years' confinement and a $10,000 fine—was in the mid-range of punishment allowed for an individual with three prior DWI convictions.  *See* Tex. Penal Code Ann. § 12.34 (Vernon Supp. 2009) (stating that the punishment range for a third degree felony is two to ten years and up to a $10,000 fine), § 49.09(b)(2) (Vernon Supp. 2009) (stating that DWI is a third degree felony if the person has previously been convicted two times of DWI).  This factor weighs in favor of the State.  In light of the foregoing, we hold that the error, if any, in overruling Marshall's objection to the State's comment during closing argument was harmless.  We overrule Marshall's second point.

---

[8] In both instances, Marshall testified that the marijuana belonged to someone else.  He stated that he, "fortunately, never had a drug problem."

## V. Conclusion

Having overruled Marshall's two points, we affirm the trial court's judgment.


BOB MCCOY
JUSTICE

PANEL: DAUPHINOT, MCCOY, and MEIER, JJ.

DO NOT PUBLISH
Tex. R. App. P. 47.2(b)

DELIVERED: January 28, 2010