COURT OF APPEALS

                                                 SECOND
DISTRICT OF TEXAS

                                                                FORT
WORTH

 

 

                                               NO.
02-09-00212-CR

 

 

BETTY SUE BRANSON                                                                     APPELLANT

 

                                                             V.

 

THE STATE OF TEXAS                                                                             STATE

 

                                                       ------------

 

              FROM
THE 371ST DISTRICT COURT OF TARRANT COUNTY

 

                                                       ------------

 

                                      MEMORANDUM OPINION[1]

 

                                                       ------------

I. 
Introduction

In
seven points, Appellant Betty Sue Branson appeals her convictions for attempted
capital murder and arson.  We affirm the
trial court=s
judgment as modified.

II.  Factual and Procedural Background

Branson
was charged with the attempted capital murder of her boyfriend, George (ABuddy@) Svec, with a deadly weapon (combustible or flammable
liquid) through the commission of arson, and with committing arson with a
deadly weapon (gasoline) on or about August 24, 2008.  The jury convicted her of both crimes, found
both deadly-weapon allegations true, and sentenced her to twelve years=
confinement for each conviction, to be served concurrently.  Because Branson challenges the sufficiency of
the evidence to support her convictions, we will address the evidence in
greater detail below.

III.  Double Jeopardy

In
her first point, Branson complains that she was denied Double Jeopardy
protection because she was convicted and punished for arson in both counts.[2]  The State concedes that Branson was denied
her constitutional protections against Double Jeopardy and requests that this
court modify the trial court=s
judgment setting out Branson=s
conviction for arson and affirm only the trial court=s
judgment of conviction and sentence for the offense of attempted capital
murder.

A.  Standard of Review

The
Double Jeopardy Clause of the United States Constitution provides that no
person shall be subjected to twice having life or limb in jeopardy for the same
offense.  U.S. Const. amend.
V.  Generally, this clause protects
against multiple punishments for the same offense.  Brown v. Ohio, 432
U.S. 161, 165, 97 S. Ct. 2221, 2225 (1977); Ex parte Cavazos, 203 S.W.3d 333, 336 (Tex. Crim. App. 2006).  To determine whether both offenses are the
same, we must examine the elements of the applicable
statutes to determine whether each statute Arequires
proof of an additional fact which the other does not.@  Blockburger
v. United States, 284 U.S. 299, 304, 52 S. Ct. 180, 182 (1932); see
United States v. Dixon, 509 U.S. 688, 696, 113 S. Ct. 2849, 2856 (1993); Parrish
v. State, 869 S.W.2d 352, 353B55
(Tex. Crim. App. 1994).  When resolving
whether two offenses are the same for double jeopardy purposes, we focus on the
elements alleged in the charging instrument. 
Bigon v. State, 252 S.W.3d 360, 370
(Tex. Crim. App. 2008).  The
general rule is that greater inclusive and lesser included offenses are the
same for double jeopardy purposes. Parrish, 869 S.W.2d at 354. 
When a defendant has been prosecuted and convicted in a single criminal
action of two or more offenses that constitute the same offense, in violation
of double jeopardy, and both offenses carry the same punishment, the appellate
court may strike either conviction.  See
Martinez v. State, 225 S.W.3d
550, 555 (Tex. Crim. App. 2007).

B.  Analysis

The
court=s
charge tracked the two counts of the indictment.  Count one charged that on or about August 24,
2008, Branson 

did
then and there, with the specific intent to commit the offense of capital
murder of George Svec, intentionally ignite a
combustible or flammable liquid with an open flame during the course of
committing or attempting to commit arson which amounted to more than mere
preparation that tended but failed to effect the commission of the offense
intended[.]  [Emphasis added.]

 

Count two charged that on or
about August 24, 2008, Branson 

did
then and there intentionally start a fire or cause an explosion by igniting a
combustible or flammable liquid with an open flame or other ignition source,
with the intent to damage or destroy a habitation, knowing said habitation was
within the limits of an incorporated city or town, and bodily injury was
suffered by George Svec by reason of the commission
of said arson[.]

 

As
the jury convicted Branson of both counts, it is readily apparent that it
convicted her of attempted capital murder, with arson as the underlying
predicate offense, and of arson causing bodily injury, thereby violating her
double-jeopardy protection.  See
Tex. Penal Code Ann. ' 19.03(a)(2) (Vernon 2008)
(stating that a person commits capital murder if he intentionally commits
murder in the course of committing or attempting to commit arson, among other
acts); see also Littrell v. State, 271 S.W.3d 273, 276, 279 (Tex. Crim. App. 2008) (holding that
appellant=s
double-jeopardy rights were violated when the trial court authorized the jury
to convict and punish him for both felony murder and the aggravated robbery
upon which the felony-murder charge was predicated).  Therefore, we sustain Branson=s
first point, set aside her arson conviction and sentence, and reform the trial
court=s
judgment to reflect only her conviction for attempted capital murder.[3]  See Martinez, 225 S.W.3d at 555.

IV.  Sufficiency of the Evidence

In
her second point, Branson challenges the sufficiency of the evidence to
establish that she acted with the specific intent to commit the capital murder
of Buddy.  We will review the evidence
only under the legal sufficiency standard because the court of criminal appeals
has recently overruled Clewis v. State,
922 S.W.2d 126 (Tex. Crim. App. 1996) (setting out
the factual sufficiency standard of review) and decided Athat
the Jackson v. Virginia legal-sufficiency standard is the only standard
that a reviewing court should apply in determining whether the evidence is
sufficient to support each element of a criminal offense that the State is
required to prove beyond a reasonable doubt.@  Brooks v. State, No.
PD-0210-09, 2010 WL 3894613, at *1, 14 (Tex. Crim. App. Oct. 6, 2010).

A.  Legal Sufficiency Standard
of Review

In
reviewing the legal sufficiency of the evidence to support a conviction, we
view all of the evidence in the light most favorable to the prosecution in
order to determine whether any rational trier of fact
could have found the essential elements of the crime beyond a reasonable
doubt.  Jackson v.
Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979); Clayton v.
State, 235 S.W.3d 772, 778 (Tex. Crim. App.
2007).

B.  Attempted Capital Murder

The
attempted-capital-murder-by-arson charge required the jury to find that
Branson, with the specific intent to commit the capital murder of Buddy,
intentionally ignited a combustible or flammable liquid with an open flame
during the course of committing or attempting to commit arson, which act
amounted to more than mere preparation that tended but failed to effect the
commission of capital murder.  See
Tex. Penal Code Ann. '' 15.01 (Vernon 2003)
(defining criminal attempt), 19.03 (Vernon 2003) (defining capital murder);
Hardy v. State, 281 S.W.3d 414, 421 (Tex. Crim.
App. 2009) (stating that the sufficiency of the evidence should be measured by
the elements of the offense as defined by the hypothetically correct jury
charge for the case, not the charge actually given).  A person commits arson if she starts a fire
with intent to destroy or damage any building or habitation, knowing that it is
within the limits of an incorporated city or town, and bodily injury or death
was suffered by any person by reason of the commission of the offense or the
property intended to be damaged or destroyed by the actor was a
habitation.  See Tex. Penal Code
Ann. ' 28.02(a)(2)(A), (d) (Vernon 2003) (defining first degree felony
arson).

C.  Evidence

1.  The State=s
Case

Branson
lived in a mobile home park in Haltom City next to Cheryl Dalton and across
from Dalton=s
daughter Heather.  Betty and Lloyd
Bright, Mark and Brenda Phillips, Karen Long, and Branson=s
mother all lived on the same street. 
Buddy lived with Branson and her chihuahuas,
Jack and Chrissy.

Cheryl
and two of her daughters, Stormi (age twenty-four)
and Jamey Jo (age twenty-nine), testified at trial.  On the morning of August 24, 2008, Jamey Jo
and Cheryl were leaving their home when they saw Branson and Buddy working in
Branson=s
yard.  Buddy gave Jamey Jo some cash to
buy him some cigarettes.  Cheryl said
that Branson looked aggravated with Buddy for talking to Jamey Jo.

Branson,
a medical assistant, went to work later that day.  Jamey Jo saw Branson when Branson came home
from work, and she heard Branson talking loudly as she unloaded dirt from her
truck.  Specifically, she heard Branson
say she was Areally
pissed off@
because Buddy had not finished the yard. 
Cheryl testified that she asked Branson whether she got her flowers
planted, and Branson replied, ANo,
I fucking didn=t.@  Branson returned shortly thereafter,
apologized for being rude and, according to Jamey Jo, said, AI=m
sorry.  It=s
not y=all; it=s him,@
and, according to Cheryl, AI=m
not mad at you, I=m mad at him.@ 








Later
that evening, Stormi and Jamey Jo were home watching
a movie when they heard banging outside and their dog started Agoing
crazy,@
barking loudly.  When they opened their
front door, which faced Branson=s
trailer, they smelled and saw smoke and saw Branson in her nightgown, beating
on her trailer=s
back door with something and screaming about her dogs being inside.  Stormi and Jamey Jo
went back inside their trailer, woke Cheryl, and told her that they thought
Branson=s
house was on fire.  Cheryl called
911.  From her front porch, Cheryl could
see and smell smoke.  She asked Branson
what was going on, and Branson replied, AMy
house is on fire.@  She asked Branson where Buddy was, and
Branson replied, AHe=s in
the fucking house, and I hope he dies.  I
hope the son of a bitch dies.@[4]

Branson=s
trailer=s
metal front door was open, but the screen door was closed, and Jamey Jo could
not see inside.  She ran to her father=s
truck, got a tire iron, ran back to Branson=s
trailer, and broke the front window.  She
saw Buddy on the floor, not moving, and flames inside the residence on the main
wall, as well as a lot of smoke.  Jamey
Jo yelled for Buddy, but he did not move.

Lloyd
Bright testified that he and his wife Betty had gone to bed when their dog
started barking.  He went to see what was
going on and saw a couple of people screaming and running around between the
Daltons=
trailer and Branson=s.  When he and his wife went outside, they could
hear fire engine sirens.

Haltom
City Fire Department Lieutenant Greg Wagner testified that he was the first
officer on the scene that night.  He saw
moderate smoke coming from the trailer=s
front door, and two women told him that there were three dogs in the trailer
that needed to be rescuedCthe woman he identified as
Branson was Avery
hysterical.@  He asked both women if anybody else was
inside, but they did not respond. 
Firefighter Phillip Perdue, who was dressed in full gear and carrying
the fire hose, stated that he was detained by two
women who tried to stand in his way. They did not move when he told them to.[5]  Lieutenant Wagner and Branson were exchanging
words[6]
when he heard Firefighter Perdue say, AWe
found a victim.@  Firefighter Perdue rescued Buddy.

Firefighter
Perdue described the interior as having visibility of two feet and being Areally,
really hot,@ and
he described Buddy as unconscious and spitting up when he found him.  While rescuing Buddy, he became tangled with a
coffee table that was between Buddy=s
location on the floor and the front door. 
When he brought Buddy out, a female yelled, AWhy didn=t you leave him in there?@

By
the time Lieutenant Wagner went inside the trailer, there was very little
active flame and the north side wall was blackened.  He did not know if the walls were actually on
fire.  There appeared to have been some
fire suppression activities prior to the firefighters=
arrival, including a garden hose through the front door that was still flowing.

Buddy
and three dogs were treated with oxygen. 
Firefighter Sterling Gilliland testified that when he started treating
Buddy, Buddy had a copious amount of mucus present in his mouth and airway and
soot from the fire around his nose and mouth, which made him think that Buddy
had smoke inhalation or airway injuries. 
When Buddy regained a semiconscious state, his breathing was irregular,
labored, and rapid, and he fell into respiratory arrest for around a minute
before beginning to breathe on his own again.

Paramedic
Jennifer Craven, who arrived with the Medstar
ambulance that night, stated that Firefighter Gilliland told her that Buddy was
Afound
unconscious in his house, had to be carried out, wasn=t
breathing appropriately when they found him, and they had to assist his
breathing until he became conscious again.@  Buddy was conscious when she spoke with him
and had no obvious burns, but his moustache was singed,
and she could smell burnt hair.  The
saliva on his face had soot in it, which indicated to her that smoke had been
deep in his lungs, and she was concerned about the possibility that he had
airway burns and swelling.  He initially
objected to being taken to any hospital and would only let her take him to the
closest, North Hills Hospital.[7]

While
Lloyd and Betty Bright stood in their driveway, Branson walked over and sat
down on the curb.  Branson screamed for a
cigarette, and Cheryl gave her one, hoping it would calm her down.  Lloyd described Branson as Apretty
angry and flailing her arms.  She kept
askingCjust
saying the same things about her dogs.@  Betty asked Branson who started the fire, and Branson replied, AI did.  I wanted him dead, but I=ve
killed my dogs.  I=ve
killed my dogs.  I=ve
killed my dogs.@[8]  The chihuahuas,
Jack and Chrissy, as well as Ladybug, Branson=s
mother=s
dog, were in Branson=s trailer on the evening of
August 24, 2008, and all three dogs died that night.

Haltom
City Police Officer Brandon St. John testified that he spoke with Buddy, Betty
Bright, Mary Cole, and Branson that evening. 
Lloyd stated that when Officer St. John came over to the Brights=
driveway and told Branson about her dogs, she went into a tirade.  Officer St. John described Branson as 

very hysterical on [the] scene, very
uncooperative.  During the investigation,
when I was speaking to her, it was very hard to talk to her.  She kept referring to her dogs, asking about
her dogs, during the course of me trying to gather information from her about
what happened during the incident.

 

 








When he told Branson that
she was not free to leave the scene, she stood up from the curb and began to
walk off.

Officer
St. John drew his taser, and Branson told him to go
ahead and shoot her.  When he armed the taser, she lifted up her nightgown, exposing herself.[9]  Officer St. John said that he did not have to
use the taser on her and that he eventually calmed
her down enough to arrest her based on the information he had gathered at the
scene.

Jamey
Jo said that Branson urinated on herself in the Brights=
driveway.  She described Branson as Agoing
crazy over there, cussing . . . screaming a lot of stuff out,@
like that A[s]he didn=t
mean to kill her dogs, she wanted to kill Buddy, and she wanted to kill us and
then herself.  She
didn=t
like us because everybody was talking about her and we=re
supposed to be her friends.@[10]

Haltom
City Fire Department Deputy Chief Charles Napp, a
fire marshal and master arson investigator, testified that what Captain Chilcutt described to him about the activities at the scene
Amore
or less raised a red flag for [them] to look for certain things at the house.@  He said that there was very little structural
damage and that it looked like there was more than one fire.  He called for a dog and handler from the
Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF), took photos, and
took samples from where the dog Ahit.@[11]  Chief Napp=s
samples included portions of the carpet and the coffee table; he also collected
a foam pillow that was on the floor and an orange cigarette lighter.

Chief
Napp found what he thought was a plastic gas can that
had melted, and he stated that based on the evidence at the scene, the samples,
and witness statements, he eliminated electrical
causes and storms as the fire=s
cause.  Because he did not find evidence
of a smoldering cigarette in the sofa, which would also not have accounted for
the fire in the middle of the floor, the evidence Abegan
to point to an intentionally set fire.@  Chief Napp
described the three types of fire in the fire industry:  arson, accidental, and undetermined, and he
gave his opinion that this fire was not accidental or undetermined.  A representative from the State Fire Marshal=s
Laboratory in Austin testified that he tested Chief Napp=s
samples and that gasoline was found on the foam pillow, the coffee table
sample, the suspected gas can, and the carpet.

Buddy
testified that he had known Branson for a year or two and that she let him move
in with her.  When Branson came home from
work on August 24, she started drinking and went through a couple of bottles of
white zinfandel.  Branson was also taking
Xanax.  Buddy
asked Branson=s
mother to come over and calm her down.

Branson
broke some items in the house that night and then went outside and retrieved
the red and black gas can that they used for the lawn mower and the weed eater.  It was less than half full of gasoline.  Branson turned the coffee table upside down
and poured gasoline onto it.  She kneeled
down and used a lighter to light the fire, which spread to the carpet.  Buddy opined that Branson was not trying to
commit suicide.

Buddy
and Branson were the only people in the trailer when it caught on fire.  He tried to get her up from where she knelt
and then went to get her mother.  He also
retrieved the fire extinguisher from the kitchenChe
had to go through the fire to get itCbut
it ran out of foam.  Buddy went outside,
found the garden hose, and tried to put the fire out with it.  He also tried to reach the dogs but was
unable to get to them.

Buddy
recalled being removed from the house and his treatment by the firefighters and
paramedics, but he did not remember the ride to the hospital.  He woke up in intensive care in the Parkland
Burn Unit in Dallas, where he was told that his lungs Agot
a little burnt and stuff@ and one of his tonsils was Amessed
up@ and
required surgery.  He also testified that
the fire melted his feet a bit.  Parkland
discharged Buddy the evening after the fire.

Buddy
had been arrested prior to testifying. 
He admitted that he had told Branson=s
counsel the night before his testimony that Awhoever
gets me out [of jail] gets my vote,@ but
he added, AI am
certainly not going to lie to get out of jail.@

Lieutenant
Wagner, Captain Chilcutt, and Chief Napp testified that gasoline, if used to start a fire, is
capable of causing death or serious bodily injury; Lieutenant Wagner added that
a combustible or flammable liquid could do the same.  Chief Napp
testified that Haltom City was incorporated in 1960. 

2.  The Defense=s
Case

Dr.
Jerry Davis, Branson=s former employer, testified
that Branson seemed very sad and distraught during the day on August 24, 2008,
and she told him that she was feeling very sad and just wanted to run away from
it all.  He described the symptoms of
major depression, stated that his assessment was that Branson had been
suffering from a severe major depression, and stated that he had been in
communication at the time with Branson=s
other doctors, including her treating psychiatrist.

Karen
Long testified that Branson lived across from her and that on the night of the
fire, Branson ran across the street, said her house was on fire, and asked
Karen to call 911.  Karen saw smoke and
called 911.  She asked Branson where the
dogs were, and Branson said that they were not in their cages.  Karen said, AI=m
going after them,@ and headed to Branson=s
house.

Karen
saw Buddy shaking the front door, trying to get in.  He managed to get it open.  Mary Cole, Branson=s
mother, joined Karen on the porch.  Buddy
had the hose and Mary helped him, trying to put the fire out.  Karen tried to get in to get the dogs but was
unable to because of the smoke.  One of
the firefighters asked Karen, AIs
anybody in there?@  She replied, ASir,
please get the dogs, but I don=t
think anybody=s in
there,@
because she thought Buddy was with them when they left the porch.  She realized she was wrong when she saw them
bring Buddy out.

Karen
went home after she saw police handcuff Branson and put her in a police
car.  She saw Buddy two days later, and
he asked her if he could move in with her. 
Karen stated that when Buddy asked if he could move in with her, he told
her that he threw a cigarette into the gas and lit it.

Karen
described Buddy as Aa liar, con man, thief,@ and
Cheryl Dalton as Aa liar.@  Karen stated that Branson and Cheryl had been
really good friends, but in the May or June before the fire, things began to
get unfriendly, and the Daltons Aaggravated
[Branson] and stood out there in that yard and harassed her and screamed at her
so much, it was just unreal, what they did.@[12]

D.  Analysis

Branson
complains that the attempted capital murder conviction required the jury to
find a specific intent to kill, not to harm, and that the evidence does not
show that she acted with the specific intent to kill Buddy.  She also argues that there is no evidence
that she knew Buddy was inside the burning trailer and that her bizarre
behavior was consistent with being suicidal. 
She concedes that Athere is no question but
that [she] started the fire, that damage was done, that the habitation was
within an incorporated city[, and t]here is no question but that bodily injury
[w]as suffered by the injured party.@[13]

Although
Branson argues that A[t]here is absolutely no
evidence to contradict [her] belief that she did not know where Buddy was,@ or
of her specific intent to kill him, the record is replete with evidence of both
Branson=s
specific intent to cause Buddy=s
death and her knowledge of his whereabouts during the fire.  Cheryl testified that Branson said Buddy was
in the burning trailer and that she hoped he died. Betty Bright testified that
Branson admitted to starting the fire and that she wanted Buddy dead but had
killed her dogs instead.  Lloyd, Jamey
Jo, and Stormi testified that they each heard Branson
state variations of this.  Viewed in the
light most favorable to the prosecution, we conclude that a rational trier of fact could have found that Branson knew where
Buddy was and that she had the specific intent to cause his death. 

Furthermore,
notwithstanding the testimonies of Cheryl, Jamey Jo, Stormi,
and Lloyd and Betty Bright about Branson=s
statements that Buddy was in the burning trailer and that she hoped he died and
wanted him dead, there was additional evidence for the
jury to consider in determining Branson=s
culpability.  Buddy described Branson=s
drinking a couple of bottles of wine that night before she turned the coffee
table upside down, poured gasoline on it, and lit the gasoline, and he opined
that Branson was not trying to commit suicide when she did this.  In contrast, Dr. Davis testified that Branson
had been severely depressed at work on the day of the fire, and Jamey Jo
testified that Branson said she wanted to kill not just Buddy but Aus@
(meaning at least the Daltons) and then kill herself.  Karen testified that Buddy and Cheryl were liars, that Buddy told her he lit the fire, and that she
thought Buddy was outside until she saw the firefighters bring him out of the
burning building.  Buddy admitted that he
had said that Awhoever
gets me out [of jail] gets my vote,@ but
he also stated that he would not lie to get out of jail.  Emergency personnel described Branson as
hysterical about her dogs but noted that she failed to mention that a person
might still be inside the burning trailer, and Firefighter Perdue testified
that two women detained him and tried to stand in his way when he attempted to
enter the trailer. 

The
jury had to determine the weight and credibility of the testimonies by Branson=s
neighbors, the emergency responders, Buddy, Branson=s
friend Karen, and Branson=s former employer, Dr.
Davis, and it did so.  See Tex. Code Crim. Proc. Ann. art.
38.04 (Vernon 1979); Brown v. State, 270 S.W.3d
564, 568 (Tex. Crim. App. 2008) (stating that the jury is the exclusive judge
of the credibility of the witnesses and the weight to be given their
testimonies), cert. denied, 129 S. Ct. 2075 (2009).  Viewed in the light most favorable to the
prosecution, we conclude that the jury could have found the essential elements
of the crime beyond a reasonable doubt.  See
Jackson, 443 U.S. at 319, 99 S. Ct. at 2789; Clayton, 235 S.W.3d at 778. 
Therefore, we hold that the evidence is legally sufficient to convict
Branson of attempted capital murder by arson, and we overrule Branson=s
second point.

V. 
Jury Argument

In
her fourth and fifth points, Branson argues that the trial court erred by
denying her motion for mistrial because the prosecutor made improper and
prejudicial remarks during the State=s
punishment phase closing arguments.

A.  Standard of Review

To
be permissible, the State=s jury argument must fall
within one of the following four general areas: 
(1) summation of the evidence; (2) reasonable deduction from the
evidence; (3) answer to argument of opposing counsel; or (4) plea for law
enforcement.  Felder v. State, 848
S.W.2d 85, 94B95
(Tex. Crim. App. 1992), cert. denied, 510 U.S. 829 (1993); Alejandro
v. State, 493 S.W.2d 230, 231 (Tex. Crim. App.
1973).

When
a trial court sustains an objection and instructs the jury to disregard but
denies a defendant=s motion for a mistrial, the
issue is whether the trial court abused its discretion in denying the
mistrial.  Hawkins
v. State, 135 S.W.3d 72, 76B77
(Tex. Crim. App. 2004).  Only in
extreme circumstances, when the prejudice caused by the improper argument is
incurable, i.e., Aso prejudicial that
expenditure of further time and expense would be wasteful and futile,@
will a mistrial be required.  Id.; see
also Simpson v. State, 119 S.W.3d 262, 272 (Tex.
Crim. App. 2003), cert. denied, 542 U.S. 905 (2004).  In determining whether a trial court abused
its discretion by denying a mistrial, we balance three factors:  (1) the severity of the misconduct
(prejudicial effect), (2) curative measures, and (3) the certainty of the
punishment assessed absent the misconduct. 
Hawkins, 135 S.W.3d at 77; Mosley v.
State, 983 S.W.2d 249, 259 (Tex. Crim. App. 1998)
(op. on reh=g), cert.
denied, 526 U.S. 1070 (1999).

B.  Prosecutor=s
Remarks

Branson
complains about these portions of the State=s
closing argument:

[Prosecutor]:  . . . Take the
priors back and take a look at them. Every boyfriend she chooses, husband,
there=s fights.  She=s
now here today before you with two convictions for tuning up boyfriends.  One physically back
a couple of years ago.  This one by
pouring out gas[oline] and
lighting his lungs on fire.  [Emphasis
added.]

 

[Defense
Counsel]: Your Honor, I=m going to
object.  There are no convictions at all.

 

The
Court: Sustained.

 

[Defense
Counsel]: Ask the jury to disregard.

 

The
Court: Jury will disregard last statement of counsel.

 

 








[Defense
Counsel]: Ask for mistrial. 

 

The
Court: Denied. 

 

. . . .

 

[Prosecutor]:  You have to stand before a judge and say, AAre you guilty or not
guilty?@  And you have to own up to it.  And the judge holds that guilty verdict in
abeyance for you to serve out your conditions of probation.  Yes, she has done that.  She has done that time and time again, and she hasn=t learned her lesson.

 

. . . .

 

[Prosecutor]:  [Defense counsel] has hired [Dr.] Price in
the past. [Defense counsel] provided the district attorney=s office with all the
medical records that were obtained under subpoena.   [Defense counsel] had the ability to bring
in Dr. Kumar Reddy here to testify. He had a chance to bring in the folks from
Millwood and Springwood where Dr. Price, back in 2001, in reading the records,
talked to you about the character flaw.  It=s not a mental disease; it=s
a character flaw where the prognosis is poor.

 

What [Defense counsel] can find, scrambling
on his laptop here in the courtroom, that=s something the University of Washington has
done is one thingC 

 

[Defense
Counsel]: Your Honor, I=m going to object to
[the] district attorney striking at client through counsel.

 

The
Court: Sustained.

 

[Defense
Counsel]:  Ask to instruct the jury.

 

The
Court: The jury will disregard the last statement of counsel.

 

[Defense
Counsel]:  And I=m going to ask for a
mistrial.

 

The
Court: Denied.

 

C.  Analysis

 

 








Branson
combines her discussion of her fourth and fifth points.  She complains that the prosecutor=s
misstatement that she had two convictions and his attack on Athe
lawful and proper actions of her counsel in advancing relevant evidence@
harmed her because the jury must have rejected probation Abased
in large part upon the prosecutor=s
argument as to [Branson=s] character as submitted to
them in argument.@

With
regard to the prosecutor=s remark about two
convictions, we note that the punishment phase evidence showed that Branson had
pleaded guilty to and been placed on deferred adjudication for possession of a
controlled substance (1998), burglary of a habitation (1998), and misdemeanor assault-Athreat/contact@
(2000), which were all dismissed upon successful completion of community
supervision, and that she had also been convicted of DWI
(2004).  Therefore, the prosecutor erred
by telling the jury that she had two convictions for Atuning
up boyfriends.@

However,
with reference to the 2000 assault case, the prosecutor had previously
explained to the jury when he entered the exhibits of Branson=s
judgments and sentences in evidence, AWhen I
said >convicted,= she
pled guilty to it.  A conviction is not
final on deferred. . . .  It=s a six-month plea of guilty.  She served out the six months.  The charge goes away on deferred adjudication
as part of the stipulation between the State and defense.@  The prosecutor explained both before closing
arguments and immediately after Branson=s
counsel objected to his remark that, while Branson had pleaded guilty to
assault, she had successfully completed her deferred adjudication and that
conviction had Ago[ne]
away.@  And the jury had just convicted Branson of
the charges against her in the instant case, resulting in one conviction
involving harm to a boyfriend and one plea of guilty to assault of
another.  We think, in light of the
prosecutor=s
explanations before and during closing arguments, that the misconduct here was
not severe.

Additionally,
with respect to the curative measures taken, the trial court correctly
sustained the objection to the Atwo-conviction@
statement and instructed the jury to disregard it.  And considering Branson=s
previous criminal history, the nature of this offense, the evidence presented
to the jury that she started the fire and wanted Buddy to die, and the fact
that the jury assessed only twelve years=
confinementCthe
lower end of the five-to-ninety-nine or life rangeCwe
conclude that there is certainty in the punishment assessed even without the
misconduct. Therefore, the trial court did not err by denying her motion for
mistrial, and we overrule Branson=s
fourth point.  See Hawkins, 135 S.W.3d at 76B77; see
also Young v. State, 137 S.W.3d 65, 69 (Tex.
Crim. App. 2004) (explaining that an instruction to disregard and a mistrial
are corrective measures; an instruction attempts to cure harm, while a mistrial
is reserved for cases in which an instruction could not cure harm, leaving the
jury in an unacceptable state to continue the trial).

With
regard to the prosecutor=s second remark, the State
called Dr. Price as a rebuttal witness during the punishment phase.  He opined that, based on his review of
Branson=s
medical records, Branson=s behavior on August 24 was
not suicidal and that her records indicated that she had a possible borderline
personality disorder.  He explained that
a personality disorder is a character trait, not a mental illness like
schizophrenia and depression, and that it is often referred to as unstable or
unpredictable personality disorder and includes Acertain
extreme, unpredictable kind[s] of behaviors that cause other people a lot of
grief and distress as well,@
such as inappropriate or intense anger. 
He testified that borderline personality disorder had no effective treatment, that Branson=s
behavior was consistent with borderline personality disorder, and that
borderline personality disorder can present a danger to others and to the
person with the disorder.

On
cross-examination, defense counsel elicited information from Dr. Price about
Dr. Price having worked for him before and that Branson had been seen by Dr.
Reddy until about two weeks before the fire. 
He asked Dr. Price about whether he could determine from Branson=s
medical records whether there was a trusting relationship between Dr. Reddy and
Branson.  Dr. Price stated that other
than the fact that nothing in Dr. Reddy=s
records of Branson=s treatment noted that there
was a problem with lack of trust, he had no idea if there was a trust
problem.  Dr. Price admitted that he did
not know Dr. Reddy or his reputation.

Defense
counsel also inquired whether Dr. Price was familiar with Adialectical
behavior therapy@ developed at the University
of Wyoming as a treatment plan for borderline personality disorder.  Dr. Price responded that he was not familiar
with the therapy and that articles on treatment for the disorder consistently
indicated a poor prognosis.  Defense
counsel did not introduce any evidence in support of the dialectical behavior
therapy.  During closing arguments, and
prior to the State=s remark at issue here,
defense counsel made the following statements:

Yes,
it is true, the district attorney brought a
psychologist.  They brought you a
psychologist that I had used myself to talk to you and tell you what possibly
may be wrong with her.  What we know is
wrong with her is that she suffers from depression, is that she was being treated
by a psychiatrist and prescribed medications. 
[Dr. Price] doesn=t know
about certain therapies for border line personality disorders.  Maybe now he=ll know.

 

Striking
at a defendant over defense counsel=s
shoulders is impermissible.  Wilson v.
State, 938 S.W.2d 57, 62 (Tex. Crim. App. 1996), abrogated
on other grounds by Motilla v. State, 78 S.W.3d 352 (Tex. Crim. App. 2002).  However, the State=s
argument about Dr. Price and the University of Washington research was proper
in that it answered the argument of opposing counsel.  See Felder, 848 S.W.2d
94B95.

Furthermore,
although it is not good practice, pointing out to the jury that no one
testified favorably for the defendant may be allowed.  See Mosley, 686 S.W.2d
at 183B84; accord
McKenzie v. State, 617 S.W.2d 211, 219B20
(Tex. Crim. App. 1981).  Because defense
counsel brought out in his cross-examination of Dr. Price that Dr. Price did
not know or know of Dr. Reddy outside of Dr. Reddy=s
medical records on Branson, the prosecutor could point out that defense counsel
could have brought Dr. Reddy, or Branson=s
other doctors, to testify about whether Branson had a mental disease or a
character flaw.  Under these
circumstances, the trial court did not have to sustain the objection, instruct the jury to disregard the statement, or grant a
mistrial.  We overrule Branson=s
fifth point. 

VI.  Voir Dire

In
her sixth point, Branson claims that the trial court erred by denying her
challenges for cause to prospective jurors because they placed the burden of
proof upon Branson to establish her innocence. 
In her seventh point, she argues that the trial court erred by denying
her request for additional peremptory challenges.

Branson
complains that she challenged for cause the following veniremembers
because they Aexpressed
that the Appellant must prove her innocence and thus were unable to follow the
law as to the burden of proof@:  Gilbert (#5), Eyler
(#8), Silvia (#28), Bucknor (#29), Nelson (#32),
Avery (#44), Saucillo (#53), Williamson (#59), and
Harlow (#60).[14]

The
trial court struck twelve members of the venire for cause, including Gilbert
(#5), Bucknor (#29), Saucillo
(#53), and Harlow (#60).  In response to
Branson=s
burden-of-proof argument on the jurors she challenged for cause, the trial
court replied, 

That=s not what I heard as to all of them.  They said they=d like to see you
prove his [sic] innocence; however, there=s no explanation how that would affect their
ability to follow the presumption of innocence in this trial or how that would
affect their ability to follow any other law or rule that would be applied to
them.

 

After
his challenges for cause were denied, Branson=s counsel stated,

 

Defense
is requesting four additional strikes because we would be required to use our
peremptory challenges onCto get rid of jurors
that we believe are placing the burden of proof on the defense and, without
additional challenges for cause, we=ll be forced to have
unqualified jurors on the jury.

 

He did not identify who
these unqualified jurors would be, and the trial court denied his request.  Branson exercised her peremptory strikes on
the following members of the venire:  #4,
#7, #8 (Eyler), #11, #19,
#20, #28 (Silvia), #32 (Nelson), #36, and #39. 
Only veniremembers #8, #20, #28, and #32 were
in the group of nine who made the controversial statement.[15]

To
preserve error regarding a trial court=s
denial of a challenge for cause, a defendant must:  (1) exercise a peremptory challenge on a
venire member whom the trial court should have excused for cause; (2) exhaust
all of his peremptory challenges; (3) request and be denied an additional
peremptory challenge; (4) identify the objectionable venire member who
actually sat on the jury whom he would have struck otherwise; and (5) make
the trial court aware of his complaint at a time and in a manner in which it
could be corrected. Loredo v. State,
159 S.W.3d 920, 923 (Tex. Crim. App. 2004); see
Johnson v. State, 43 S.W.3d 1, 5B6
(Tex. Crim. App. 2001); see also Tex. R. App. P. 33.1.  Further, an appellant challenging denials of
challenges for cause is entitled to appellate review of denials only with
respect to jurors he used statutory peremptory strikes to exclude.  Busby v. State, 253 S.W.3d 661, 671 (Tex. Crim. App.), cert. denied, 129
S. Ct. 625 (2008).  If the issue has been
preserved, the appropriate standard of review for the denial of a challenge for
cause is an abuse of discretion standard. 
Curry v. State, 910 S.W.2d 490, 493
(Tex. Crim. App. 1995).

Branson
has failed to preserve her complaint for our review because, in addition to not
using all of her peremptory strikes on jurors that she challenged for cause,
she failed to identify to the trial court (or to this court) an objectionable veniremember who actually sat on the jury and who she would
have otherwise struck had the trial court not denied her challenges for cause
or her requests for additional peremptory strikes.  See Loredo, 159 S.W.3d at 923.  That is, of the veniremembers
Branson complains of on appeal, she used peremptory strikes on Eyler (#8), Silvia (#28), and Nelson (#32), but not on
Avery (#44) and Williamson (#59), who were not otherwise selected to sit on the
jury.[16]  See id.  And the trial court struck Gilbert (#5), Bucknor (#29), Saucillo (#53),
and Harlow (#60) for cause.[17]  We overrule Branson=s
sixth and seventh points.

VII.  Conclusion

Having
sustained Branson=s first point and overruled
her second through seventh points, we modify the trial court=s
judgment to vacate the conviction and sentence for arson and to reflect only
the conviction and sentence for attempted capital murder.  We affirm the trial court=s
judgment as modified.

 

 

PER CURIAM

 

PANEL:  MCCOY, GARDNER, and WALKER, JJ.

 

DO
NOT PUBLISH

Tex.
R. App. P. 47.2(b)

 

DELIVERED:
November 4, 2010











[1]See Tex. R. App. P.
47.4.





[2]That is, she argues
that Athe Arson in Count 2
was but a lesser included offense of Count 1,@ and that the manner
and means of the arson in both counts is identical, as is the time and victim.





[3]Based on our
resolution here of count two of the indictment (arson), we need not address
Branson=s third point, in
which she complains that the evidence is insufficient to establish in count 2
that she Aknew or intended that
by such arson that the injured party would suffer such bodily injury.@  See Tex. R. App. P. 47.1.





[4]Stormi testified that she
heard Branson say, in response to Cheryl=s question about where Buddy was, that she did not care where Buddy was, that Ashe wanted that SOB
dead,@ and that she had to
get inside to find her dogs.  Jamey Jo
testified that Branson told Cheryl that Buddy was still inside and that she Awishe[d] the son of a
bitch would die.@





[5]Haltom City Fire
Department Captain David Chilcutt testified that he
saw Engineer Hudson physically remove a woman from the scene and that he found
out later that she was upset because the fire department would not let her go
back into the trailer to find her animals.





[6]Lieutenant Wagner
testified about the following exchange with Branson:

 

When I told her to
get out of the way, she advised me that we don=t know how to do our
FBing job.  I told her, I said, AMa=am, you need to step
out of the way.  Let us do our job.@  And as I went through the gate up the steps,
she said she=d go in and get [the
dogs] herself.  I turned around and
advised her, AYou=re not going
inside.  You need to stay back.@





[7]North Hills Hospital
subsequently transferred Buddy to Parkland Hospital in Dallas.





[8]Lloyd stated that he
heard Branson say, AI started the
fire.  I wanted him dead.@  Branson did not say who she wanted dead.





[9]Lloyd stated that Branson
flashed everyone in response to the officer=s question about whether she had any weapons
and that the officer did not pull out his taser until
she flashed him.





[10]Cheryl described  Branson as Agoing wild,@ and testified that
Branson said she was going to get them, pointing at Brenda Phillips=s house and Betty and
Lloyd Brights= house. 
Cheryl asked her, AWhat do you mean you=re going to get?@  Branson replied, AAll you do is talk
about us,@ and AI=m going to get y=all.  I was going to get y=all.@





[11]Bedford Fire
Department Lieutenant Joey Lankford (cross-designated as ATF Special Agent
Lankford) and canine Rio performed a demonstration for the jury of how Rio
detects accelerants.





[12]Testimony during the
State=s case revealed that
during the last year that they lived next to each other, Branson and Cheryl had
not been on speaking terms.  But in the
weeks leading up to the fire on August 24, 2008, their relationship improved,
and Branson told Cheryl that Buddy had been stealing electricity from the
Daltons.  Cheryl called the police about
this theft less than three weeks before the fire.





[13]Additionally, there
is legally sufficient evidence, as set out above, to support each of these
elements.





[14]Each of these agreed,
in response to Branson=s counsel=s question, AWhat do I have to do
during this trial?@ that
he needed to prove his client=s innocence.  Following those statements, however, Branson=s counsel responded, 

 

Okay.  All right.  I ain=t got to do nothing.
. . .  I can sit in this chair right
here, except it will be right here, and do absolutely nothing the entire time,
and I have done my job.  I get paid a lot
of money to do nothing.  You think I=m going to do that?

 

The
venirepanel responded, ANo.@  He then continued, AOkay.  I don=t have to call witnesses.  I don=t have to question anyone.  I don=t have to say anything.  Who really thinks I=m going to not say
something?  I don=t have to present
innocence.  Is this fair?@  The venirepanel
responded, AYes.@





[15]Veniremembers #19 and #39 were in
law enforcement, #11 had travel plans, and #36 suffered from back pain.  We cannot tell from the record why defense
counsel might have struck veniremembers #4 and #7.





[16]Furthermore, even if
she had preserved error, she would only be entitled to appellate review of her
challenges to Eyler (#8), Silvia (#28), and Nelson
(#32), because these are the jurors she used statutory
peremptory strikes to exclude.  See
Busby, 253 S.W.3d at 671.





[17]We also cannot see
how Branson could have been harmed, since none of the veniremembers
she complains of on appeal were seated as jurors.