

# IN THE COURT OF CRIMINAL APPEALS
# OF TEXAS

## NO. PD-0636-19

## MICHAEL ANTHONY HAMMACK, Appellant

## v.

## THE STATE OF TEXAS

## ON APPELLANT'S PETITION FOR DISCRETIONARY REVIEW
## FROM THE SIXTH COURT OF APPEALS
## HUNT COUNTY

**NEWELL, J., delivered an opinion in which HERVEY, RICHARDSON, YEARY, WALKER, SLAUGHTER and MCCLURE, JJ., joined. KELLER, P.J., filed a dissenting opinion in which KEEL, J., joined.**

Does the State have to prove that a defendant was served with a copy of an emergency protection order that removes a child from custody to establish that a person commits the offense of "Interference with Child Custody"? No. The plain terms of the statute only require proof that the person who takes or retains a child in violation of a judgment or order,

including a temporary one, knows that he or she is doing so in violation of such an order. Proof that the person has been served with a temporary order may satisfy the State's burden to prove such knowledge, but it is not required if knowledge can be proven through other means. In this case, the State presented sufficient evidence that Appellant knew about the existence and relevant terms of the emergency protection order even though the evidence showed he had successfully avoided service. Consequently, we affirm the court of appeals.

## Background

On February 23, 2018, a school counselor contacted the Texas Department of Family and Protective Services ("the Department" or "TDFPS")[1] regarding her concerns about potential child abuse involving Appellant's sixteen-year-old daughter.[2] Department Investigator Amber Davidson opened a case and called Appellant, telling him about the investigation. Later that day, Davidson went to Appellant's home to investigate, but Appellant told her to get off his property and to come

---

[1] TDFPS is also interchangeably referred to as "Child Protective Services" and "CPS" throughout the record.

[2] During a pre-trial hearing it was revealed that Appellant was accused of sexually abusing his daughter and that this abuse was one of the findings that supported the issuance of the emergency protective order at issue in this case. However, at the end of the pretrial hearing, the trial court issued a limiting instruction restricting the introduction of evidence of the specific allegation.

back with a court order.

She did. On February 27, 2018, Davidson obtained (1) an Order of Protection of a Child in an Emergency ("the Order") that awarded custody of Appellant's child to the Department; and (2) a Writ of Attachment that commanded any sheriff or constable in Texas to take the child and deliver her into the Department's possession.[3] This order granted sole managing conservatorship of the child to TDFPS as well as sole right of possession and custody of the child.[4]

That same day, Davidson returned to Appellant's residence, accompanied by Department Investigator Rhonda West, to serve Appellant the Order. Davidson and West identified themselves and explained to Appellant that, pursuant to the Order, they were there to take custody of the child. Appellant immediately became aggressive and ordered them off his property. According to West, Appellant knew who

---

[3] Emergency protection orders under Chapter 262 do not use terms such as "joint" or "shared" custody, they only contemplate two scenarios: 1) removal of a child, granting TDPRS "temporary managing conservatorship; and 2) removal of the perpetrator of the abuse from the home if another parent or guardian is in the home. *See* TEX. FAM. CODE §§ 262.101, 262.1015.

[4] At trial, Appellant agreed to a stipulation of evidence that the order granted sole custody and possession of his child to TDFPS. This stipulation and the emergency protective order were admitted into evidence as exhibits.

she was and was not surprised that she was there.[5]   Based on her interactions with Appellant, she had "no doubt" that at that time Appellant understood that a court order had been issued to retain the child and knew that TDFPS had custody of the child.

Davidson and West left Appellant's residence but went to the child's school, where they took custody of the child with the assistance of the school's resource officer.   After bringing the child back to the Department's office, Davidson telephoned Appellant to tell him that the Department had obtained custody of the child as a result of the Order and had thus picked her up at school. Davidson asked Appellant to come to the office so she could give Appellant the paperwork and talk to him about the situation.   Appellant asked how Davidson had obtained the Order. When Davidson replied with the name of the judge who signed the Order, Appellant said, "[T]hat can't be possible because I only work with a different judge."  Appellant did not comply with Davidson's request to come to the office.

Based upon the phone conversation, Davidson testified that Appellant was "fully aware" that TDFPS had custody at that point.

---

[5] West testified that Appellant already knew who she was because of past interactions with her.

Davidson had "no doubt" that Appellant understood that TDFPS had taken custody of the child pursuant to a Court Order and Writ of Attachment when she telephoned him.

After the phone call, the child escaped from TDFPS custody and the Greenville and Commerce Police Departments were alerted. Commerce Police Officer Kelvin Rhodes traveled to Appellant's home, joined separately by TDFPS investigators. Officer Rhodes asked Appellant if his daughter was home or if he had heard from her, but Appellant said that she was not there and that he had not. Rhodes informed Appellant "[t]hat we were in search of [the child] due to her being missing from the custody of Child Protective Services." Appellant did not appear to be surprised by this information. It appeared that he knew the child was supposed to be with the Department. Rhodes' search of the home revealed that the child was not there.

Shortly after Officer Rhodes confronted Appellant, the TDFPS investigators drove to other residences to look for the child, including the child's mother's house, Appellant's mother's house, the house where the child's sister was staying, and the child's boyfriend's house. When their attempts were unsuccessful, they returned to Appellant's mother's house for a second time. As they approached the house, TDFPS Investigator

Torres noticed a car that was not there previously and called the Commerce police to inquire about the car.

While waiting for the police, Torres saw the child and the child's then-boyfriend walk into the house. Commerce Police Officer Marcus Cantera arrived and spoke with Appellant's mother, Linda Hammack. He told Linda that the child had escaped from the Department after the writ of attachment was executed and that he was looking for her. Linda testified that she was never told why the police were looking for her granddaughter. Linda allowed Cantera to enter the house and look for the child. While searching, Cantera heard people talking in the attic and found Appellant on a ladder leading to the attic. Appellant began yelling and accusing Cantera of violating his constitutional rights. On witnessing the confrontation, Linda recanted her prior consent to Cantera's search of the house.

As Cantera was leaving, Appellant followed him outside. Cantera pointed out the TDFPS vehicle parked three or four feet away, which contained two TDFPS investigators who were waiting to transport the child if found. According to Cantera, Appellant "was told about the order before [he] got there" and knew that the Department had temporary custody of the child.

Less than a week later, Appellant brought the child, who was pregnant, to Oklahoma and consented to her marriage to her eighteen-year-old boyfriend. The following day, Investigator Davidson received a phone call telling her that someone had seen the child at Appellant's residence. Davidson and a Commerce police officer retrieved the child from Appellant's home.

The State charged Appellant with interference with child custody. A jury convicted him and sentenced him to two years' confinement in state jail. The trial court placed Appellant on community supervision for a term of five years. The terms and conditions of his probation specified that Appellant could not live with the child (or any of his children) or have unsupervised access to any child under eighteen years of age.

## Appeal

In his sole point of error on appeal, Appellant claimed that the evidence was legally insufficient to prove he knew he was violating the terms of a judgment or order when he secreted the child. Appellant did not contest the fact that he retained the child in violation of the terms of a temporary order. Instead, he challenged the jury's finding that he had knowledge of the Order.

The court of appeals concluded that the evidence was legally

sufficient to support the jury's verdict of guilt and affirmed the trial court's judgment.[6] The court reasoned that although Appellant was not formally served with the Order, Investigator West, Investigator Davidson, Officer Rhodes, and Officer Cantera all testified that Appellant had been repeatedly notified about the Order and that he knew TDFPS had obtained custody of the child pursuant to that order.[7] From this testimony and Appellant's participation in secreting the child, the court of appeals held that a jury could infer that Appellant knew he was violating the terms of a child-custody order by retaining the child.[8]

### Standard of Review

In assessing the legal sufficiency of the evidence to support a criminal conviction, we consider all the evidence in the light most favorable to the verdict and determine whether, based on that evidence and reasonable inferences therefrom, a rational juror could have found the essential elements of the crime beyond a reasonable doubt.[9] We

---

[6] *Hammack v. State*, 06-18-00212-CR, 2019 WL 2292334, at *3 (Tex. App.—Texarkana May 30, 2019) (not designated for publication).

[7] *Id*.

[8] *Id.*

[9] *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007) (citing *Jackson v. Virginia*, 443 U.S. 307, 318–19 (1979)).

measure legal sufficiency by the elements of the offense as defined by a hypothetically correct jury charge.[10] "Such a charge [is] one that accurately sets out the law, is authorized by the indictment, does not unnecessarily increase the State's burden of proof or unnecessarily restrict the State's theories of liability, and adequately describes the particular offense for which the defendant was tried."[11]

A reviewing court must defer to the jury's credibility and weight determinations because the jury is the "sole judge" of witnesses' credibility and the weight to be given testimony.[12] In reviewing the sufficiency of the evidence, we should look at "'events occurring before, during and after the commission of the offense and may rely on actions of the defendant which show an understanding and common design to do the prohibited act.'"[13] Each fact need not point directly and independently to the guilt of the appellant, as long as the cumulative force of all the incriminating circumstances is sufficient to support the conviction.[14]

---

[10] *Malik v. State*, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997).

[11] *Id.*

[12] *Garcia v. State*, 367 S.W.3d 683, 687 (Tex. Crim. App. 2012).

[13] *Hooper*, 214 S.W.3d at 13 (quoting *Cordova v. State*, 698 S.W.2d 107, 111 (Tex. Crim. App. 1985)).

[14] *Hooper*, 214 S.W.3d at 13.

Circumstantial evidence is as probative as direct evidence in establishing the guilt of an actor, and circumstantial evidence alone can be sufficient to establish guilt.[15] On appeal, the same standard of review is used for both circumstantial and direct evidence cases.[16]

In some cases, sufficiency of the evidence also turns on the meaning of the statute under which the defendant has been prosecuted.[17] In other words, a reviewing court must perform a statutory analysis to determine the elements of the offense before reviewing the evidence presented.[18] That question, like all statutory construction questions, is a question of law, which we review de novo.[19]

**Analysis**

Penal Code § 25.03(a)(1) sets out the elements of the offense of "Interference With Child Custody" as follow:

(a)   A person commits an offense if the person takes or retains a child younger than 18 years of age:

(1)   when the person knows that the person's taking or

---

[15] *Id.*; *Guevara v. State*, 152 S.W.3d 45, 49 (Tex. Crim. App. 2004).

[16] *Id.*

[17] *Alfaro-Jimenez v. State*, 577 S.W.3d 240, 244 (Tex. Crim. App. 2019).

[18] *See id.*

[19] *Id.*

> retention violates the express terms of a judgment or order, including a temporary order, of a court disposing of the child's custody.[20]

Under the terms of the statute, the State must show that Appellant knew that his retaining of the child violated "the express terms of a judgment or order, including a temporary order, of a court disposing of the child's custody."[21] This necessarily means that there must be evidence showing that the person both knew of the child custody order as well as the express terms of that order. Knowledge may be proven with circumstantial evidence and inferred from the acts, words, and conduct of the accused.[22]

Appellant does not argue that the State failed to prove the existence of a valid child-custody order; he argues instead that a rational juror could not have found that he knew about the express terms of the Order because there was no evidence presented that he had been actually served with the Order or told the contents of the Order. First, we disagree with Appellant that he "was never informed in any manner of the

---

[20] TEX. PENAL CODE § 25.03(a)(1).

[21] *Id*.; *Ex parte Rhodes*, 974 S.W.2d 735, 741 (Tex. Crim. App. 1998).

[22] *Nisbett v. State*, 552 S.W.3d 244, 267 (Tex. Crim. App. 2018) (citing *Hernandez v. State*, 819 S.W.2d 806, 810 (Tex. Crim. App. 1991)).

express terms of the order."[23] As explained in more detail below, Appellant was told that TDFPS was awarded temporary custody of his daughter—an express term of the protective order. Second, contrary to Appellant's assertion, the statute does not require proof of service, only knowledge of a violation of the express terms of the Order. Though proof of services may, in a given case, help establish the element of knowledge, it is not statutorily required.

In *Harvey v. State*, we interpreted Penal Code § 25.07—the statute making it an offense to violate a protective order.[24] In that case, we explained that the statutory language "in violation of an order" was not modified by a culpable mental state.[25] However, we also observed that the statute listed specific types of statutorily defined orders, each one having specific notice requirements, among them actual service, necessary to make each respective order "binding."[26] Consequently, we held that there was "in effect" a requirement of knowledge due to the

---

[23] Appellant's Br. 9.

[24] *Harvey v. State*, 78 S.W.3d 368, 371 (Tex. Crim. App. 2002).

[25] *Id.*

[26] *Id.*

statutory notice requirements attendant to those listed protective orders.[27]

But this does not translate to a requirement for proof of service to satisfy

the knowledge element attendant to the statute at issue in this case.  In

*Harvey*, we pointed to statutory notice requirements to suggest that the

State was required to show knowledge because knowledge was not an

obvious element of the offense.[28]  We used the statutory requirements for

the orders themselves to explain why a showing of knowledge was

required, not to proscribe a particular way in which the State must prove

that knowledge.[29]

In contrast, § 25.03(a), the statute at issue in this case, does not list

specific statutory sections governing child custody orders; it only refers

generically to a "judgment or order, including a temporary order, of a

court disposing of the child's custody."[30]  There is no indication that the

statutory service requirements of a particular child custody order must be

incorporated into the terms of the offense.  And there is already a

---

[27] *Id.* at 372–73.

[28] *Id.* at 371 ("We read Section 25.07(a) to prescribe a culpable mental state for the element 'in violation of an order,' because the meaning of that term necessarily includes certain knowledge that amounts to a mental state.").

[29] *Id*. at 371–73.  Notably, we left open the possibility in *Harvey* that, even if an out-of-state order was issued without notice, a defendant's "actual notice" of such an order may be sufficient to prove violation-of-protective-order offense.  *Id.* at 373.

[30] *See* TEX. PENAL CODE § 25.03(a)(1).

knowledge requirement listed in the statute ("a person commits an offense . . . when the person knows that the . . . taking . . . violates the express terms of a judgment or order"),[31] so there is no need to resort to the statutory requisites for child custody orders to justify a knowledge requirement in the statute.

While proof of service may provide direct evidence of knowledge of the order's terms, the statute does not preclude circumstantial evidence establishing that knowledge.  Indeed, such is the case here.  Although Appellant was not formally served with the Order, the jury was presented with other evidence from which it could reasonably infer that Appellant knew there was a child-custody order and that retaining his child violated the express terms of that order.

The State presented evidence that Appellant was familiar with TDFPS and the investigators who attempted to take custody of the child due to previous interactions.  He was told more than once that TDFPS had a child custody order authorizing it to take custody of the child at issue.  At trial, Investigator Davidson testified that she told Appellant that CPS had custody of the child:

---

[31] *Id.*

A. [Davidson] . . . And I had asked him to come meet me at the office so we could get him the paperwork and to speak with me about the situation.

Q. [Prosecutor] Okay. And so, based on what you told him, he's fully aware CPS has custody at this point?

A. Yes.

Q. And that she was in your custody?

A. Yes.

Further, Investigator West testified that, while attempting to serve the Order and Writ of Attachment, Appellant was again informed of CPS's custody over the child:

Q. [Prosecutor] Okay. And did he– did you explain to him why you were there?

A. [West] Yes, sir.

Q. Okay. And is there any doubt in your mind that he understood that an order had been issued by the Court to retain [the child] in your custody?

A. Yes, sir.

Q. And there is a doubt or no doubt?

A. No doubt.

Investigator West would reiterate that Appellant knew CPS had custody of the child:

> Q. [Prosecutor] Based on your interactions with the accused, is there any doubt in your mind, in your opinion, that the [Appellant] knew that CPS had custody of [the child] at that point?
>
> A. [West] There is no doubt.

Finally, Officer Rhodes testified that he informed Appellant that the child was in the custody of CPS and that Appellant was not surprised by this fact:

> Q. [Prosecutor] What – what did you inform Michael Hammack that your purpose was when you first approached the house?
>
> A. [Kevin Rhodes] That we were in search of [the child] due to her being missing from the custody of Child Protective Services.
>
> Q. Okay. So you had explained as part of that, that he – she was in the custody of Child Protective Services?
>
> A. Yes, sir.
>
> Q. Let me ask you this. Did he seem surprised by that at the time?
>
> A. No, sir, he didn't.
>
> Q. Okay. In fact, he – he knew that she was supposed to be with Child Protective Services, in your opinion; is that right?
>
> A. Yes, sir.

Shortly after the child was seen walking into Appellant's mother's house,

a police officer entered the home with the owner's consent. The officer heard people talking in the attic and almost immediately found Appellant on the attic ladder. Then, days after this incident, Appellant brought his child to Oklahoma for a "shotgun wedding" to her boyfriend.

A rational juror could have reasonably inferred from this evidence combined with Appellant's stipulation of evidence and the terms of the emergency order itself that Appellant knew that TDFPS had sole custody and possession of the child pursuant to the emergency order.[32] The terms of the emergency order established that TDFPS was named sole managing conservator of the child and was awarded sole custody and possession of the child. Several witnesses testified that they informed Appellant of the existence of the Order and that it awarded TDFPS custody of the child. A rational juror could have inferred from the testimony that these witnesses explained to Appellant that TDFPS had been awarded sole custody of the child, particularly in light of the testimony that Appellant insisted that TDFPS obtain such an order before he would comply with their demands. Moreover, a rational juror could have also drawn the inference that

---

[32] *Jackson*, 443 U.S. at 318–19 (the fact-finder is permitted to draw reasonable inferences from facts when supported by the evidence); *Hooper*, 214 S.W.3d at 16 (under the *Jackson* test, juries are permitted to draw multiple reasonable inferences from the evidence—direct or circumstantial—as long as each inference is supported by the evidence presented at trial).

Appellant tried to hide the child and that he married her off to avoid compliance with the TDFPS order, rather than, as he argued, to prevent an out-of-wedlock birth.[33]

The facts in this case are similar to facts before the First Court of Appeals in *Briggs v. State.*[34] In *Briggs,* multiple witnesses testified that they had informed the appellants that CPS had custody of their child, but no order was formally served.[35] On appeal, appellants challenged the trial court's denial of their motion for an instructed verdict by arguing that they were unaware of the existence of an order[36]. The court of appeals affirmed and noted that a jury was free to believe the testimony of multiple witnesses that they had personally informed appellants that the child was in the custody of CPS under authority of a court order.[37] The same reasoning applies in this case. In light of the evidence before us, a

---

[33] We have noted that certain conduct by a defendant can be construed as circumstantial evidence of consciousness of guilt. *See e.g. Bigby v. State*, 892 S.W.2d 864, 883 (Tex. Crim. App. 1994) ("evidence of flight or escape can support an inference of guilt"); *Guevara*, 152 S.W.3d at 50 (attempts to hide or conceal evidence can proves consciousness of guilt); *Felder v. State*, 848 S.W.2d 85, 98 (Tex. Crim. App. 1992) (fact that appellant presented false identification to a police officer when he was pulled over indicates a "consciousness of guilt"); *Gill v. State*, 873 S.W.2d 45, 48 (Tex. Crim. App. 1994) (defendant's secretive actions after the offense used as a corroborating circumstance).

[34] *Briggs v. State*, 807 S.W.2d 648 (Tex. App.—Houston[1st Dist.] 1991, pet. ref'd.)

[35] *Id.* at 649-50.

[36] *Id.* at 651.

[37] *Id.*

rational fact-finder could have inferred that Appellant knew there was a temporary emergency protective order depriving him of custody of the child and that retaining the child in his custody violated the express terms of that order.

Appellant argues that his conduct merely displays a distrust of TDFPS and not knowledge of the Order or its express terms.[38] We disagree. A rational juror, hearing the evidence, could have determined that Appellant had no reason to question Davidson's veracity.[39] Appellant knew she worked for TDFPS and had been investigating him for abusing his daughter. After Appellant refused to help her with her investigation, Davidson did exactly what Appellant suggested—she returned with a court order. Then, when she was unable to obtain custody of the child at Appellant's house, Davidson retrieved the child from school and promptly notified him that TDFPS had obtained custody of his daughter. Furthermore, the truthfulness of Davidson's custody-related statement was confirmed by law enforcement when police showed up at Appellant's house and told Appellant that they were searching for the child who had

---

[38] *See Harvey*, 78 S.W.3d at 374 ("[Appellant's] defense had nothing to do with a lack of knowledge about the protective order. It was to question the credibility of the witnesses to an act of family violence.").

[39] *See* State's Br. 16.

escaped TDFPS custody. Rather than negate Appellant's culpable mental state, this evidence also helped establish it.[40]

## Conclusion

The offense of "Interference With Child Custody" requires proof that a person knows he is violating the express terms of a "judgment or order, including a temporary order, of a court disposing of the child's custody" by retaining a child subject to that order. Proof of service of such an order may provide sufficient evidence of knowledge in a given case, but if there is sufficient circumstantial evidence to prove that the person has knowledge of the temporary emergency protective order and the terms he or she is violating, evidence of service is not required. In this case, a rational trier-of-fact could have inferred Appellant knew of the order at issue and that retaining his child violated that order. We affirm.

Delivered: May 19, 2021

Publish

---

[40] Appellant does not argue that the Order at issue in this case did anything other than grant TDPRS "temporary managing conservatorship" and sole custody and possession of the child. As mentioned above, he stipulated to this understanding of the Order at trial. But even if Appellant were to argue that he understood the order to grant "joint" or "shared" custody, Appellant's actions of secreting the child away from TDFPS and depriving TDFPS access to the child when he knew TDFPS was looking for her would have violated such an order. *See Briggs*, 807 S.W.2d at 651.